MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2020 ME 131
Docket:        Ken-19-221
Argued:        December 6, 2019
Decided:       November 10, 2020

Panel:         MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ., and CLIFFORD, A.R.J.*

CHARLES W. PALIAN

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

CONNORS, J.

[¶1]  Charles W. Palian, DMD, appeals from a judgment of the Superior Court (Kennebec County, *Stokes, J.*) denying his petition for judicial review of final agency action, M.R. Civ. P. 80C, and affirming the decision of the Commissioner of the Department of Health and Human Services accepting the recommendation of an administrative presiding officer that the Department correctly established and maintained a claim in the amount of $116,852.05 against Dr. Palian.

---

* Although Chief Justice Saufley participated in the appeal, she resigned before this opinion was certified.  Justice Alexander also participated in the appeal, but he retired before this opinion was certified.  Although not present at oral argument, Justice Horton, Justice Connors, and Active Retired Justice Clifford participated in the development of this opinion.  *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

2

[¶2]  We reject the bulk of Dr. Palian's arguments, but remand as to one aspect of the Department's decision, which imposed the maximum allowable penalties for Dr. Palian's failure to adequately document time spent with patients following his administration of anesthesia.

## I.  BACKGROUND

[¶3]  The following undisputed facts are drawn from the presiding officer's recommended decision, and the procedural facts are taken from the court's record.  *See Manirakiza v. Dep't of Health & Hum. Servs.*, 2018 ME 10, ¶ 2, 177 A.3d 1264.

[¶4]  Until he retired in 2013, Dr. Palian was an oral surgeon and MaineCare provider[1] whose practice, Central Maine Oral and Maxillofacial Surgery Associates, P.A. (Central Maine), was based in Auburn.  In late 2014, after Dr. Palian's retirement, the Department initiated a post-payment review of claims that Dr. Palian had submitted for reimbursement.[2]  The review was conducted by Valerie Hooper, an employee in the Department's Program Integrity Unit.  In October 2015, based on Hooper's post-payment review, the

---

[1]  Dr. Palian signed a MaineCare/Medicaid provider agreement in September 2009, contractually obligating him to adhere to MaineCare's rules and regulations.

[2]  The Department randomly selected 100 dates of service within an identified review period of September 1, 2010, to December 31, 2013.

Department issued a notice of violation (NOV), alleging that Dr. Palian had been overpaid by $189,770.08.[3]

[¶5] By statute, 22 M.R.S. § 42(7) (2020), and pursuant to the MaineCare Benefits Manual, *see generally* 10-144 C.M.R. ch. 101, ch. I, § 1 (effective Sept. 17, 2018),[4] an administrative challenge to an NOV is multi-tiered. A provider may first request an informal review to be conducted by the Director of MaineCare Services or a designated Department representative who was not involved in the decision under review. *Id.* § 1.23-1. After obtaining an informal review decision, if the provider remains dissatisfied, he or she may request an administrative hearing before a presiding officer. *Id.* § 1.23-1(A). The presiding officer then issues a written decision to the provider or a written recommendation to the Commissioner of Health and Human Services, who makes the final decision. *Id.* The final decision may be appealed to the Superior

---

[3] The NOV cited the following violations of MaineCare rules and regulations: (1) improper or incomplete documentation with respect to interpreter services, radiographs, anesthesia recovery times, tooth numbers for tooth extractions and dates of service; (2) improper coding for nonemergency hospital procedures; (3) improper coding for Versed, Fentanyl, Ketamine, Propofol, and Valium; (4) billing for drugs above acquisition cost; (5) duplicate payments, payments for services covered through primary insurance, or payments not billed to primary insurance; (6) improper coding for comprehensive oral evaluation; and (7) improper coding for alveoplasty when fewer than four teeth per quadrant were extracted.

[4] During the periods of time relevant to this appeal, 10-144 C.M.R. ch. 101, ch. I, § 1 was amended several times, most recently on September 17, 2018. None of the amendments is relevant to the issues presented on appeal, and the parties do not contend that any of the amendments affect our analysis.

4

Court in accordance with the Maine Administrative Procedure Act. *Id.*; *see* 5 M.R.S. § 11001 (2020).

[¶6] Dr. Palian requested an informal review in which he responded to the Department's allegations and argued that the Department failed to pay him for multiple claims that he submitted for reimbursement. Hooper reviewed and prepared responses to Dr. Palian's request, consulted with Herbert Downs, director of the Department's Division of Audit, and provided to Downs a draft letter of decision for his use in the informal review. Downs issued his final informal review decision in August 2016, adopting Hooper's draft letter, which revised the overpayment calculation to $147,329.89 based on the arguments raised by Dr. Palian.

[¶7] Dr. Palian timely requested an administrative hearing, which was held on July 17, 2017, and January 9, 2018. Based on evidence presented at the hearing, and before a decision was issued by the presiding officer, the Department reduced its total claim to $116,852.05. Before the hearing, the Department had imposed penalties of 100% for lack of documentation of anesthesia recovery times. Those penalties were upheld at the informal review stage because Dr. Palian's records did not indicate that he spent any time with MaineCare patients after administering anesthesia. Following the hearing, the

Department reduced these anesthesia penalties from 100% to 20% because it accepted Dr. Palian's testimony that his standard practice was to remain with patients as the standard of care required.

[¶8] The presiding officer issued a recommended decision on June 5, 2018, upholding the Department's recoupment claim for $116,852.05, as provided in a revised recoupment demand spreadsheet submitted after the hearing. In so recommending, the presiding officer concluded that Hooper's assistance of Downs in conducting the informal review did not violate Dr. Palian's procedural rights; the Department was not equitably estopped from maintaining its claims; and Dr. Palian failed to preserve his argument regarding penalties for improperly documented claims, except with respect to the 20% penalties for improper documentation of anesthesia recovery time because those penalties were not in effect at the time of the informal review.

[¶9] Dr. Palian filed responses and exceptions to the presiding officer's recommended decision on June 19, 2018. Two weeks later, Commissioner Ricker Hamilton issued a one-sentence final decision adopting the presiding officer's recommended decision in full.[5] Dr. Palian timely appealed the

---

[5] Although the Commissioner's final decision is the decision of the fact-finding agency, because the Commissioner adopted the presiding officer's recommended decision with no further explanation, the recommended decision contains the relevant findings of fact and conclusions of law.

Commissioner's decision to the Superior Court pursuant to M.R. Civ. P. 80C. The court denied his petition for judicial review, and Dr. Palian timely appealed from the judgment. M.R. App. P. 2B(c).

## II. DISCUSSION

[¶10] "When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review the administrative agency's decision directly for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Manirakiza*, 2018 ME 10, ¶ 7, 177 A.3d 1264 (quotation marks omitted). We review questions of law de novo, and "[t]he party seeking to overturn the agency's decision bears the burden of persuasion." *Doe v. Dep't of Health & Hum. Servs.*, 2018 ME 164, ¶ 11, 198 A.3d 782.

A.    Equitable Estoppel

[¶11] Dr. Palian argues that the Department should be estopped from seeking recoupment or imposing penalties because he followed MaineCare's instructions for submitting claims and reasonably relied on MaineCare's repeated approval and payment of his claims.

[¶12] "Equitable estoppel precludes a party from asserting rights which might perhaps have otherwise existed . . . ." *Dep't of Health & Hum. Servs. v.*

*Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630 (quotation marks omitted). In general, we view with caution any effort to invoke equitable estoppel against the government. *Mrs. T. v. Comm'r of the Dep't of Health & Hum. Servs.*, 2012 ME 13, ¶ 10, 36 A.3d 888. To prevail, a party asserting an equitable estoppel defense against a governmental entity must show that "(1) the statements or conduct of the government official or agency induced the party to act; (2) the reliance was detrimental; and (3) the reliance was reasonable." *Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630. Equitable estoppel requires a misrepresentation, which need not consist of an affirmative statement but may arise through a combination of misleading statements, conduct, or silence. *Id.* ¶ 18. "When reviewing an equitable estoppel defense, we consider the totality of the circumstances, including the nature of the government official or agency whose actions provide the basis for the claim and the governmental function being discharged by that official or agency." *Id.* ¶ 17 (quotation marks omitted).

[¶13] The MaineCare Benefits Manual and the MaineCare provider agreement both contain several provisions that put—or should have put—Dr. Palian on notice that his billing activity might one day be scrutinized more closely. The Manual states, "The Division of Audit or duly Authorized Entities appointed by the Department have the authority to monitor payments to any

8

MaineCare provider by *an audit or post-payment review*." 10-144 C.M.R. ch. 101, ch. I, § 1.16 (emphasis added).[6]

[¶14]   More specifically, the Manual requires that "records must be retained for a period of not less than five (5) years from the date of service or longer if necessary to meet other statutory requirements. *If an audit is initiated within the required retention period*, the records must be retained until the audit is completed and a settlement has been made." *Id.* § 1.03-8(M)(3) (emphasis added).[7]  The Manual also requires providers to "[m]aintain accurate, *auditable* and sufficiently detailed financial and statistical records to substantiate cost reports, negotiated rates, by report items, or any other fee for service rate for a period of at least five (5) years following the date of final settlement or established rate with the Department." *Id.* § 1.03-8(Z) (emphasis added).[8]  The Manual clearly contemplates that an audit or post-payment review may be initiated after the provider has been reimbursed for services.

---

[6]  The version of this provision in effect at the relevant time used the term "Authorized Agents" rather than "Authorized Entities."  10-144 C.M.R. ch. 101, ch. I, § 1.16 (effective Jan. 11, 2010).

[7]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.03-3(N) (effective Jan. 11, 2010) and 10-144 C.M.R. ch. 101, ch. I, § 1.03-3(M) (effective June 24, 2013).

[8]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.03-3(X) (effective Jan. 11, 2010).

[¶15]  Further, the provider agreement Dr. Palian signed expressly states that the Department "may collect any debts, including overpayments, through offset or recoupment."  The agreement requires that providers "retain all medical, financial, administrative and other records and documents required by the [Manual] . . . for at least five (5) years from the date of service."  It goes on to say that "[i]f any litigation, claim, negotiation, *audit* or other action involving the records has been started before the expiration of the 5-year period, the records must be retained until completion of the action . . . or until the end of the regular 5-year period, whichever is later."  (Emphasis added.)

[¶16]  Pursuant to the provider agreement, Dr. Palian was "expressly responsible for understanding and applying applicable regulations and requirements for proper billing."[9]  Thus, he knew or should have known that the Department could conduct an audit or post-payment review even after his claims for reimbursement were submitted and approved.  *See id.* § 1.16.

[¶17]  Although Dr. Palian argues that the remittance advice forms provided to him by the Department indicated that his claims had been "allowed," there is no record evidence that the Department ever represented to

---

[9]  Contrary to Dr. Palian's position, his "familiarity with the MaineCare rules" is not "irrelevant." Pursuant to the provider agreement, he was responsible for understanding and applying the rules.

Dr. Palian that the claims, once paid, would never be subject to further review or that payment of the claims marked the end of the matter. The Manual's repeated references to "post-payment review" make clear that the mere payment of claims does not immunize payments from later review.[10] *Id.* §§ 1.16, 1.18. In light of the unambiguous provisions in both the Manual and the provider agreement clearly indicating that claims may be subject to audit or post-payment review, Dr. Palian's claimed reliance on the remittance advice forms was not reasonable.[11] *See id.* § 1.16; *cf. Shackford & Gooch, Inc. v. Town of Kennebunk*, 486 A.2d 102, 106 (Me. 1984).

[¶18]   In sum, given the claw-back provisions contained in the Department's regulations, the Commissioner did not err in accepting the

---

[10] Dr. Palian's reliance argument rests on the notion that if the Department had "let Dr. Palian know in a timely manner that it objected to his billing practices, he could have modified those practices while he was still in practice." Pursuant to the provider agreement, however, it was Dr. Palian's responsibility—not the Department's—to ensure that his billing practices complied with the Manual.

[11] Dr. Palian relies heavily on the fact that the Manual instructs providers "to bill their usual and customary charge for all dental services." 10-144 C.M.R. ch. 101, ch. III, § 25 (effective July 1, 2014). However, he fails to acknowledge that the next sentence in the billing instructions clearly states that MaineCare will "*pay the lowest of* . . . [t]he fee established by MaineCare and noted in the Maximum Allowance column of the fee schedule; . . . [t]he lowest amount allowed by Medicare; or . . . [t]he provider's usual and customary charge." *Id.* (emphasis added) (quotation marks omitted). Therefore, even though providers are requested to bill their usual and customary charge, the Manual is clear that MaineCare may not reimburse them for that amount, and, again, Dr. Palian agreed that the Department was entitled to recoup any overpayments by signing the provider agreement.

presiding officer's conclusion that the Department was not equitably estopped from recouping the $116,852.05 in overpayments made to Dr. Palian.

B.      Informal Review of the NOV

[¶19]  Next, Dr. Palian argues that the Commissioner erred in accepting the presiding officer's conclusion that the Department did not violate its own rules when Hooper, who prepared and issued the original NOV, drafted the informal review decision ultimately adopted by Downs.  *See* 10-144 C.M.R. ch. 101, ch. I, § 1.23-1.[12]

[¶20]  Whether the Department violated its rules is a question of law that we review de novo, and Dr. Palian bears the burden of persuading us that an error occurred.  *See Doe*, 2018 ME 164, ¶ 11, 198 A.3d 782.  Our precedent instructs us to "give considerable deference to the agency's interpretation of its own rules, regulations, and procedures, and [we] will not set aside the agency's findings unless the rule or regulation plainly compels a contrary result." *Beauchene v. Dep't of Health & Hum. Servs.*, 2009 ME 24, ¶ 11, 965 A.2d 866 (quotation marks omitted).

---

[12]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.21-1 (effective Jan. 11, 2010).  It has not been amended in any way relevant to this appeal.

[¶21]  The Manual provides that informal reviews "will be conducted by the Director of MaineCare Services, or other designated Department representative who was not involved in the decision under review." 10-144 C.M.R. ch. 101, ch. I, § 1.23-1.  Downs, the director of the Department's Division of Audit, conducted the informal review.  He was not involved in the decision under review—the NOV.

[¶22]  Although it is undisputed that Hooper, who prepared and issued the NOV, was involved in the informal review process, the presiding officer found, based on competent evidence in the record, that "Mr. Downs applied Ms. Hooper's consultative work as a part of the Final Informal Review he conducted—that he, as the Director of the office in which she worked, independently gauged the correctness of her review and conclusions, and adopted those that his judgment determined were correctly reached."  The relevant Manual provision, 10-144 C.M.R. ch. 101, ch. I, § 1.23-1, does not plainly compel a contrary result; thus, we defer to the Department's interpretation and implementation of this provision.  *See Beauchene*, 2009 ME 24, ¶ 11, 965 A.2d 866.

C.     Penalties

    1.     Imposition of Penalties for Improperly Documented Claims

[¶23]  Dr. Palian challenges the Department's methodology for imposing penalties for improperly documented claims.  Our discussion here pertains to the penalties of 20% that were imposed in the NOV and were in effect at the time of the request for an informal review.[13]  Dr. Palian argues that the Department abused its discretion in imposing these "original" 20% penalties because it failed to consider the various factors laid out in the Manual that may be considered when determining penalties to be imposed, and he contests the presiding officer's conclusion that he waived this argument by failing to raise this issue in his request for an informal review.

[¶24]  Again, we review questions of law de novo, and Dr. Palian bears the burden of persuasion.  *See Doe*, 2018 ME 164, ¶ 11, 198 A.3d 782.  We defer to the agency's interpretation of the relevant provisions of the MaineCare Benefits Manual.  *See Beauchene*, 2009 ME 24, ¶ 11, 965 A.2d 866.

[¶25]  The Manual provides that "[i]issues that are not raised by the provider . . . through the written request for an informal review or the

---

[13]  These penalties are distinct from the penalties for improper documentation of time spent with patients during anesthesia recovery, discussed below, which were reduced to 20% after the informal review.

14

submission of additional materials for consideration prior to the informal review are waived in subsequent appeal proceedings."  10-144 C.M.R. ch. 101, ch. I, § 1.23-1.  In his written request for an informal review, Dr. Palian argued that certain sanctions for improper or inadequate documentation were incorrectly imposed, but he did not argue that the Department abused its discretion by imposing the maximum sanction of 20%, as opposed to a lesser penalty, or by failing to consider the factors set out in the Manual.  *See* 10-144 C.M.R. ch. 101, ch. I, § 1.20-3(A)(1).[14]  In other words, he argued only that no penalty should have been imposed, not that a lesser penalty was appropriate based on the discretionary factors contained in the Department's rules.  The Commissioner, therefore, committed no legal error in accepting the presiding officer's conclusion that Dr. Palian waived this issue by failing to raise it in his request for informal review.[15]

---

[14]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.19-3(A)(1) (effective Jan. 11, 2010).  It has not been amended in any way relevant to this appeal.

[15]  Contrary to Dr. Palian's argument, this rule deeming issues not raised at the informal review stage waived does not conflict with 22 M.R.S. § 42(7) (2020).  Dr. Palian contends that because the administrative hearing was conducted de novo, he was free to raise any issue, regardless of whether it was raised at the informal review stage.  This proposition is supported neither by the text of section 42 nor the case law cited by Dr. Palian. Section 42(7)(A) describes the administrative hearing as "an appeal hearing for *review* of the department's informal review decision."  (Emphasis added.)  Issues that could have been but were not raised at the informal review stage could not be properly reviewed at the administrative hearing stage because the Department never had the chance to address them in the first instance.

2.    Claims for Nonemergency Hospital Procedures

[¶26]  Next, Dr. Palian argues that the Commissioner erred in accepting the presiding officer's recommendation to uphold the "penalties" imposed for incorrectly using a certain billing code, D9410, listed in 10-144 C.M.R. ch. 101, ch. III, § 25 (effective July 1, 2014), to bill MaineCare for procedures performed in a hospital operating room.[16]

[¶27]  The Manual directs providers to the American Dental Association's Current Dental Terminology (CDT) for guidance, which is published annually and includes a glossary and schedule of billing codes. *Id.* ("Every effort should be made to utilize the correct code.  Billing should be done in accordance with the CDT guidelines and Chapter II and Chapter III, Section 25.").  Pursuant to the CDT, billing code D9410 allows for additional payment when dental services are performed in houses or extended care facilities, such as "nursing homes, long-term care facilities, hospice sites, [or] institutions."  To receive this additional payment, providers are instructed to bill for qualifying services under D9410 "in addition to reporting appropriate code numbers for actual services performed."

---

[16]  Although Dr. Palian uses the term "penalties," the record reflects that the Department only sought recoupment of overpayment for procedures performed in a hospital setting.

[¶28] Dr. Palian contends that he was permitted to bill for the procedures he performed in a hospital operating room under billing code D9410 because hospitals fall within the category of "institutions." The Department's position is that hospitals are not "institutions" as that term is used in D9410. The Department maintains that providers may receive additional payment for dental services rendered in a hospital by using a different billing code, D9420, but only when the service provided is "emergency room trauma care."[17] *Id.* The CDT indicates that a provider may receive additional payment using billing code D9420 when treating a patient "in a hospital or ambulatory surgical center,"[18] but section 25 expressly limits the use of billing code D9420 to "emergency room trauma care." Thus, unless the services are provided in a house or extended care facility, or for emergency room trauma care in a hospital or ambulatory surgical center, a MaineCare provider may bill only for the services provided and is not eligible for any additional payment.

[¶29] The Department's interpretation is a reasonable one, and the language of the billing codes at issue does not plainly compel a contrary result.

---

[17] Dr. Palian does not contend that the services he provided in the hospital settings were for emergency room trauma care. *See* 10-144 C.M.R. ch. 101, ch. III, § 25 (effective July 1, 2014).

[18] At the administrative hearing, the presiding officer admitted in evidence excerpts from the 2009-2010 and 2011-2012 editions of the CDT. The title and definition of billing code D9420 was amended in the 2011-2012 edition but not in any way that affects this appeal.

*See* 10-144 C.M.R. ch. 101, ch. III, § 25; *Beauchene*, 2009 ME 24, ¶ 11, 965 A.2d 866. The very names assigned to the two codes support the Department's position: billing code D9410 is titled "House/Extended Care Facility Call" and billing code D9420 is titled "Hospital or Ambulatory Surgical Call Center."[19] 10-144 C.M.R. ch. 101, ch. III, § 25. Moreover, if the Department had intended to permit providers to claim additional payments for ordinary, nonemergency hospital visits, it could have simply omitted the limitation in D9420. Without that limitation, all services rendered in hospitals, emergency or otherwise, would be covered. *See id.* In light of the plain language and express limitation in D9420, we are not persuaded that D9410—a separate code applicable to house and extended care facility visits that makes no reference to hospitals—encompasses all services provided in hospital settings. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 168 (1st Cir. 2009) ("[I]f the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." (quotation marks omitted)).

---

[19] Billing code D9420 was previously titled "Hospital Call" but contained the same limitation of "[u]se for emergency room trauma care." 10-144 C.M.R. ch. 101, ch. III, § 25 (effective Aug. 9, 2010).

[¶30] Therefore, the Commissioner did not err in accepting the presiding officer's conclusion that "[n]either code is applicable, based on plain language, to non-emergency, outpatient surgeries performed in hospital operating rooms" and "that the proper billing procedure for dental surgeries performed on a non-emergency, outpatient basis in hospital operating rooms is to employ only the code for the underlying dental surgery service performed."

3.      Overpayments Related to the Acquisition Cost of Drugs

[¶31] Next, Dr. Palian contends that the Commissioner erred in accepting the presiding officer's conclusion that the Department was entitled to recoup the difference between what he billed per dose of certain drugs and the true acquisition cost of those drugs.

[¶32]   Dr. Palian is correct that the Manual states, "Providers are requested to bill their usual and customary charge for all dental services." 10-144 C.M.R. ch. 101, ch. III, § 25.   The billing code related to the administration of the relevant drugs, however, plainly limits the MaineCare reimbursement to "[a]cquisition cost only." *Id.*  Thus, although Dr. Palian was permitted to bill his usual and customary charge for administering the drugs, the Department was entitled to limit its payment to the acquisition cost and to seek recoupment of any overpayment.

4.    Imposition of 20% Penalties for Failure to Properly Document Time Spent with Patients Following Administration of Anesthesia

[¶33]  We now turn to Dr. Palian's claim that the Department erred by imposing 20% penalties for his failure to properly document time spent with patients following his administration of anesthesia.  As a preliminary matter, Dr. Palian claims that it was error for the Commissioner to accept the presiding officer's recommendation to uphold the 20% penalties assessed against him for improperly documenting time spent with patients following administration of anesthesia because he was not required to keep "any specific form of documentation . . . substantiating his determination as to when it was appropriate to leave a patient following anesthesia."[20]

[¶34]   MaineCare providers are required to "[m]aintain and retain contemporaneous financial, provider, and professional records sufficient to fully and accurately document the nature, scope and details of the health care and/or related services or products provided to each individual MaineCare member."  10-144 C.M.R. ch. 101, ch. I, § 1.03-8(M).[21]  The provider's records

---

[20]  As already noted, these anesthesia-related penalties are distinct from the "original" 20% penalties discussed above because they were initially imposed at 100%, upheld at that level in the final informal review decision, and reduced to 20% only after the Department accepted Dr. Palian's testimony at the hearing.

[21]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.03-3(M) (effective Jan. 11, 2010) and did not contain the word "contemporaneous."

20

must include, among other things, the "duration of services." *Id.* § 1.03-8(M)(1). Therefore, Dr. Palian's assertion that no documentation was required to show how long he stayed with patients following anesthesia administration is incorrect.

[¶35]  Dr. Palian also argues, however, that the Department did not properly exercise its discretion in setting the anesthesia-related penalties at the 20% cap.  To support his argument, Dr. Palian points to Hooper's testimony at the hearing that she had no discretion in determining whether a penalty below 20% was warranted and that it is "sort of the standard practice" of the Department to penalize at the cap.

[¶36]  Pursuant to its rules and consistent with statute, 22 M.R.S. § 42(7)(H), the Department may impose a penalty equal to 100% recoupment of services deemed not medically necessary, not covered by MaineCare, or not actually provided.  10-144 C.M.R. ch. 101, ch. I, § 1.20-2(H)(1).[22]  In contrast, if the issue is merely a lack of documentation for properly provided and covered

---

[22]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.19-2(G)(1) (effective Jan. 11, 2010).

services, then the Department may impose a penalty "not to exceed" 20%. *Id.*

§ 1.20-2(H)(2).[23]  The Department rule provides:

### 1.20-3  Rules Governing the Imposition and Extent of Sanction

#### A.  Imposition of Sanction

The decision to impose a sanction shall be the responsibility of the Commissioner of the Department of Health and Human Services, who may delegate sanction responsibilities to the Division of Audit, and the Director of MaineCare Services.

1. The following factors may be considered in determining the sanction(s) to be imposed:

   a. Seriousness of the offense(s);

   b. Extent of violation(s);

   c. History of prior violation(s);

   d. Prior imposition of sanction(s);

   e. Prior provision of provider education;

   f. Provider willingness to obey MaineCare rules;

   g. Whether a lesser sanction will be sufficient to remedy the problem; and

   h. Actions taken or recommended by peer review groups, other payers, or licensing boards.

---

[23]  This provision was previously located at 10-144 C.M.R. ch. 101, ch. I, § 1.19-2(G)(2) (effective Jan. 11, 2010).

10-144 C.M.R. ch. 101, ch. I, § 1.20-3(A)(1).

[¶37]  Dr. Palian first raised this argument as to the Department's lack of exercise of discretion in applying the factors in its rule in his written closing argument at the administrative hearing.  The Department countered that, as with the penalties originally set by the Department before the hearing, the argument was not preserved because Dr. Palian did not argue at the informal review stage that a penalty at the cap was not warranted.  The presiding officer rejected the Department's position because the penalties on these anesthesia-related claims had not been calculated at 20% when Dr. Palian submitted his informal review request.

[¶38]  As the presiding officer's recommended decision recognized, the Department's reduction of the penalties from 100% to 20% was based on its acceptance of Dr. Palian's hearing testimony "as proof that the time billed actually correlated to the services provided."  *See id.* § 1.20-2(H).  Thus, as Dr. Palian points out, there is no dispute at this stage that the monitoring of patients took place or that the monitoring was medically necessary.  *See id.*

[¶39]  As the presiding officer found and the Commissioner accepted, however, Dr. Palian's "relevant patient records did not satisfy the *documentation* standard where they did not clearly indicate the amount of time

actually spent with the patients after anesthesia was administered" (emphasis added), as required by 10-144 C.M.R. ch. 101, ch. I, § 1.03-8(M).

[¶40]  For this reason, and without further explanation or reference to the factors contained in the rule governing the imposition and extent of sanctions, the presiding officer concluded that "the Department . . . correctly maintained such violations at the 20[%] sanction rate."  The one-sentence adoption by the Commissioner of the presiding officer's recommendation does not elaborate upon this point, and thus also does not articulate whether or how the Department exercised its discretion in penalizing Dr. Palian at the cap.

[¶41]  When "dealing with a determination or judgment [that] an administrative agency alone is authorized to make, a court must judge the propriety of such action solely by the grounds invoked by the agency." *Me. Motor Rate Bureau*, 357 A.2d 518, 527 (Me. 1976) (alteration omitted) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  An "important corollary" to this rule is that the basis for the agency's action "must be set forth with such clarity as to be understandable." *Id.* (quotation marks omitted).  We cannot "guess at the theory underlying the agency's action," nor can we "chisel that which must be precise from what the agency has left vague and indecisive." *Id.*; *see Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 24, 843 A.2d 18

24

(holding that "we may not hypothesize" about an agency's reasoning); *Gashgai v. Bd. of Registration in Med.*, 390 A.2d 1080, 1085 (Me. 1978) ("Courts need to know what an agency has really determined in order to know even what to review. We must know what a decision means before the duty becomes ours to say whether it is right or wrong." (citation omitted) (quotation marks omitted)).

[¶42] In sum, although the Commissioner did not err in accepting the presiding officer's recommendation to uphold some penalty for lack of documentation, the Department's decision is devoid of any explanation why it chose to impose the penalties at the cap. The Department failed to identify any factors it considered, let alone whether any of those factors fell within the parameters established in its rule.

[¶43] We addressed a similar issue in *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, 843 A.2d 18. In that case, the appellant challenged a decision of the Board of Social Worker Licensure on the basis that the Board had failed to articulate why it chose the specific sanctions it imposed against her. *Id.* ¶ 20. The Board countered "that it was not required to explain why it chose" the sanctions "over any other sanctions because it appropriately exercised its discretion in imposing the sanctions." *Id.* In our decision, we

noted that there was no dispute that the appellant had violated the pertinent rules and that the Board had the authority to impose the sanctions it chose. *Id.* ¶¶ 14, 22. But we nevertheless vacated the Board's decision on the basis that the Board failed "to explain *why* it decided to impose the sanctions it chose." *Id.* ¶ 24 (emphasis added). We stated:

> Both statute and case law require the Board to set out findings that justify its decision; we may not hypothesize about the Board's reasoning. Because we may only determine whether the Board acted within the bounds of its discretion if we understand the specific facts that justify the sanctions imposed, we must require the agency to articulate its reasons for imposing the sanctions.

*Id.* (citations omitted); *see also Gashgai*, 390 A.2d at 1085; 5 M.R.S. § 9061 (2020). The same reasoning applies with equal force in this case.

[¶44] The Department's treatment of its rule listing factors it may consider further underscores the lack of an articulated rationale reflecting the exercise of discretion.

[¶45] It is a fundamental tenet of administrative law that agencies must follow their own rules and regulation. *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008); *see also Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 388-89 (1932) (holding that an administrative agency was bound to recognize the validity of its prescribed rules). Dr. Palian contends that the eight factors listed in 10-144 C.M.R. ch. 101, ch. I, § 1.20-3(A)(1) "constitute the

exclusive list" of factors that the Department must consider in exercising its discretion in setting the penalty between zero and 20%. The Department responds that the rule does not make consideration of these factors mandatory, and it was "not required to apply the factors . . . toward reducing the sanction below 20[%]." While we defer to a reasonable interpretation of a rule by a state agency, *Beauchene*, 2009 ME 24, ¶ 11, 965 A.2d 866, it is unclear exactly how the Department is interpreting its rule—whether the eight listed factors are those that it may consider and no others or whether it may consider those factors along with others not listed in the rule. Instead, the Department appears to be positing that it need not consider *any* factor, whether listed in the rule or not. This interpretation would not only render the rule wholly irrelevant but suggests that the Department is arguing that it may set the penalty at the cap based on no factor at all, thereby abdicating its duty to apply discretion.

[¶46] While the relevant question for us is what the Department articulated in its written decision, and not on which factors we speculate the Department may have based its decision given the evidentiary record, as noted above, Hooper testified that no discretion was exercised at the NOV stage, and neither Downs nor the Commissioner testified at the hearing to suggest any

factors—either listed in its rule or otherwise—were considered at their stages of review.[24]

[¶47]  Because the Department failed to explain its decision, and, therefore, we are unable to determine whether the Department properly exercised its discretion, we vacate that portion of the judgment affirming that the Department acted within its discretion in imposing penalties at the 20% rate for the anesthesia-related claims and remand the matter to the Department to articulate its rationale.  *See Zegel*, 2004 ME 31, ¶ 24, 843 A.2d 18; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. __, 140 S. Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action.  If those grounds are inadequate, a court may remand for the agency to . . . offer a fuller explanation of the agency's reasoning . . . ." (citation omitted) (quotation marks omitted)).

---

[24] Furthermore, at the hearing, in discussing a non-anesthesia-related penalty initially set at 20%, when Hooper was asked whether a particular billing discrepancy was "a serious mistake," and she responded that it was "subjective," counsel for the Department objected, arguing "[T]hat's irrelevant whether it was serious or not.  It's irrelevant whether she considers it serious or not.  It doesn't meet the rule requirement."  The gravity of an offense seems to fit the first two factors listed in the Department's rule, 10-144 C.M.R. ch. 101, ch. I, § 1.20-3(A)(1)(a)-(b), and would be a logical consideration in exercising discretion.  Not only is it not our role to "chisel" from the record a viable rationale for an agency decision, *Me. Motor Rate Bureau*, 357 A.2d 518, 527 (Me. 1976), this record is at a minimum confused as to whether the Department views numerosity or other similar aspects of a deficiency relating to its gravity as even relevant.

[¶48] It would be helpful for the Department, in explaining its rationale, to provide its interpretation as to the import of its existing rule. We note that by listing specific factors for review in setting a penalty, a rule promulgated pursuant to the Maine Administrative Procedure Act can set parameters for the exercise of agency discretion that advance the goal of predictable, nonarbitrary decision-making. *Cf. Uliano v. Bd. of Env't. Prot.*, 2009 ME 89, ¶ 28, 977 A.2d 400 ("[B]y providing significant protection against abuses of discretion by the Board in exercising its rule-making authority, the requirement that the Board promulgate rules subject to the Maine Administrative Procedure Act compensates substantially for the want of precise [legislative] guidelines." (quotation marks omitted)).

[¶49] In all other respects, we affirm the judgment.

The entry is:

> Judgment affirmed in part and vacated in part. Remanded to the Superior Court for remand to the Department of Health and Human Services for further proceedings consistent with this opinion.

Joshua D. Hadiaris, Esq. (orally), and David A. Goldman, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellant Charles Palian

Aaron M. Frey, Attorney General, and Thomas C. Bradley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Kennebec County Superior Court docket number AP-2018-49
FOR CLERK REFERENCE ONLY