MAINE SUPREME JUDICIAL COURT
Decision:    2021 ME 19
Docket:      Ken-20-168
Argued:      February 10, 2021
Decided:     April 6, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

Reporter of Decisions

JOSHUA A. GRAY

v.

DEPARTMENT OF PUBLIC SAFETY

HUMPHREY, J.

[¶1]  In this appeal, we consider whether the First Amendment rights of an applicant for a professional license were abridged by the application of statutory competency standards to his conduct on social media.[1]

[¶2]  Joshua A. Gray appeals from a judgment of the Superior Court (Kennebec County, *Murphy, J.*) affirming the Department of Public Safety's denial of Gray's application for a professional investigator license based on posts and comments that Gray made on social media, using an account bearing the name of his out-of-state private investigation business, concerning a Maine

---

[1]  Gray raises the free speech provisions of only the United States Constitution, U.S. Const. amend. I, and does not make any argument regarding the Maine Constitution's free speech protections. *See* Me. Const. art. I, § 4; *City of Bangor v. Diva's, Inc.*, 2003 ME 51, ¶¶ 10-11 & n.4, 830 A.2d 898; *Portland v. Jacobsky*, 496 A.2d 646, 648-49 (Me. 1985).

2

State Police lieutenant. Gray argues that the court erred in concluding that the Department had not, in denying his application, violated his free speech rights conferred by the First and Fourteenth Amendments of the United States Constitution.[2] Although Gray challenges the determination that he acted with "actual malice"[3] in posting and commenting on social media, we conclude that actual malice need not be shown and that we must apply intermediate scrutiny to review the licensing standards as applied to Gray here. Applying that standard, we affirm the judgment.

## I. BACKGROUND

[¶3] On January 26, 2018, Gray applied to the Department for a professional investigator license. *See* 32 M.R.S. § 8107 (2020). The Chief of the Maine State Police issued the decision of the Department denying Gray's application on August 31, 2018. *See* 32 M.R.S. §§ 8103(1-B), 8113 (2020). The Department found that Gray had made "materially false" statements on social

---

[2] Gray also argues that the court abused its discretion in deciding the matter without holding oral argument. Oral argument was not required by M.R. Civ. P. 80C(l), *see Lindemann v. Comm'n on Governmental Ethics & Election Pracs.*, 2008 ME 187, ¶ 26, 961 A.2d 538, and we discern no abuse of discretion in the court's decision not to hear oral argument before deciding the matter. Gray did not bring any independent claims, and the court rejected as untimely his notice of objection to the record—a ruling that Gray does not challenge on appeal. *See* M.R. Civ. P. 80C(f) (requiring that notice of an objection to the record be served on the agency within ten days after the record is filed).

[3] Statements are made with "actual malice" when they are made with knowledge that they are false or with reckless disregard of their truth or falsity. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 80 (1964); *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 573-75 (1968).

media, including on his private investigation business's Facebook page, which cast into question Gray's "ability to competently investigate and then report investigative findings with accuracy, objectivity, and without bias," and, as a result, that Gray lacked the requisite competency and fitness of character to act as a professional investigator in Maine.

[¶4] Gray appealed to the Superior Court. *See* 5 M.R.S. § 11001(1) (2020); M.R. Civ. P. 80C. The court held that the Department could not deprive Gray of a license for having expressed himself on social media unless the statements he made fell outside the protection of the First Amendment. The court remanded for the Department to determine whether the limited privilege that applies to even false statements about public figures on matters of public concern was overcome by a finding, by clear and convincing evidence, that Gray made the statements on social media with "actual malice," meaning with knowledge that the statements were false or with reckless disregard of their truth or falsity. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 573-75 (1968).

[¶5] On remand, the Department propounded thirty-nine questions to Gray about certain assertions he had made using a social media account identifying himself as a "PI" and including the name of his Massachusetts

4

private investigation business, NSI Surveillance & Investigation. Gray responded to the questions and admitted that he had made on social media posts and comments that stated that a Maine State Police lieutenant was "[p]ossibl[y] drunk" during the time of a police incident that resulted in a woman's death and that the lieutenant had "murdered" the woman. He asserted to the Department that the statements were opinions, not facts, and that when he learned that another officer—not the lieutenant whom he had named—had shot the woman, he provided that information on social media. He also admitted that he had stated on social media that the lieutenant had been the subject of multiple internal affairs investigations, though he again asserted that his statement was an expression of opinion.

[¶6]  During its examination of Gray's responses, the Department reviewed affidavits from (1) the lieutenant in question, who swore that he had not consumed alcohol on the day of the incident or at any time during his life, and (2) the commander of the Department's Office of Professional Standards (OPS), formerly the Office of Internal Affairs, who reported that only one complaint had been made against the lieutenant—a complaint initiated by Gray that had resulted in an investigation. The Department also considered

hundreds of pages of printouts of Gray's posts and comments on social media and other internet platforms.

[¶7]    The Department issued a second decision denying Gray's application, finding that Gray had made certain statements on social media with actual malice—knowing that they were false or with reckless disregard of their truth or falsity—including statements about the lieutenant's intoxication; statements that the lieutenant had "murdered," "executed," or "killed" the woman who died in the incident; and statements that the lieutenant had been subject to multiple complaints filed with the OPS.

[¶8]  The decision also stated, however, that the actual malice standard did not apply because even if Gray had the right to say the things he did, he was not entitled to a professional license if he did not meet the competency and character standards for a professional investigator.  The Department found that Gray had reported erroneous, uninvestigated conclusions on social media, placing behind those conclusions "the authority of the reputation of [Gray's] business" and of "the private investigator license of the State of Massachusetts." The Department also found that Gray "lacks the basic competency and requisite good moral character" to hold a professional investigator's license and that his

6

"communications have demonstrated a pattern of reckless disregard for the truth."

[¶9]  On October 28, 2019, Gray again appealed to the Superior Court by filing a petition for review of the Department's denial of his application for a license.  *See* 5 M.R.S. § 11001(1); M.R. Civ. P. 80C.  The court entered a judgment on June 1, 2020, affirming the Department's decision, concluding that the Department's finding of actual malice was supported by the administrative record.  Gray timely appealed, and the Department cross-appealed.  *See* 5 M.R.S. § 11008 (2020); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶10]  We review an administrative agency's decision "directly for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record."  *Palian v. Dep't of Health & Hum. Servs.*, 2020 ME 131, ¶ 10, 242 A.3d 164 (quotation marks omitted).  To conduct this review here, we will (A) summarize the standards governing the licensing of professional investigators in Maine and (B) review whether the Department, in denying Gray's license application, violated the First Amendment.

A.      Standards for Licensing Professional Investigators

[¶11]   Licensed professional investigators in Maine are authorized to conduct private investigations, including by accepting consideration to obtain information about a crime committed in violation of the law or "[t]he identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person."  32 M.R.S. § 8103(4-A)(A), (B) (2020).  The statutes governing the licensing of professional investigators in Maine establish qualifications for a license, an application process, and standards for denying an application. *See* 32 M.R.S. §§ 8105, 8107, 8113 (2020).

[¶12]   To qualify for a professional investigator license, a person must have "demonstrated good moral character." *Id.* § 8105(4).  The Chief of the Maine State Police may refuse to issue a license if an applicant is incompetent, meaning that the applicant "[e]ngaged in conduct that evidences a lack of ability or fitness to discharge the duty owed by the licensee to the client or the general public" or "[e]ngaged in conduct that evidences a lack of knowledge or an inability to apply principles or skills to carry out the practice" for which the person seeks the license. *Id.* § 8113(6).  A license may also be denied if the applicant has violated "standards of acceptable professional conduct adopted by rule" by the Chief of the Maine State Police. *Id.* § 8113(11); *see* 32 M.R.S.

8

§ 8103(1-B). No standards of conduct have been adopted by rule, however,[4] meaning that the applicable standards are those provided by statute.

B.     First Amendment

[¶13] The construction of the First Amendment presents a question of law that we review de novo. *See Palian*, 2020 ME 131, ¶ 10, 242 A.3d 164; *Burr v. Dep't of Corr.*, 2020 ME 130, ¶ 20, 240 A.3d 371.

[¶14] The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. By virtue of the Fourteenth Amendment, the prohibition against governmental abridgement of the freedom of speech applies to state governments. *See* U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."); *Jones v. Sec'y of State*, 2020 ME 113, ¶ 19, 238 A.3d 982.

[¶15] Gray argues that the record does not support a finding of actual malice, but the Department argues in response that the actual malice standard is not applicable. To resolve this dispute, we (1) determine the proper standard for evaluating whether the First Amendment has been violated in these

---

[4] The only adopted rule pertaining to professional investigators requires a written examination regarding "handgun safety, weapons handling mechanical operations, and use of force." 16-222 C.M.R. ch. 9, § 9.03 (effective Aug. 1, 1998).

circumstances, and (2) apply that standard in reviewing the Department's decision on Gray's application.

1.      Standard for Determining a First Amendment Violation

[¶16]  We review the constitutionality of the applicable statutes as they were applied and do not treat Gray's argument as a facial constitutional challenge because Gray does not argue that the challenged statutes "cannot be applied constitutionally on any set of facts." *Guardianship of Chamberlain*, 2015 ME 76, ¶ 10, 118 A.3d 229.

[¶17]  Gray analogizes his situation to that of the teacher in *Pickering v. Board of Education*, whose employment was terminated after he criticized the local board of education in a published letter to the editor of a newspaper. 391 U.S. at 564-65.  Unlike in *Pickering*, however, Gray has not had government employment terminated based on his exercise of the right to speak as a private citizen on a matter of public concern.[5]  *See id.* at 564-65, 573-74.  Rather, he has

---

[5]  Such a termination of government employment may violate First Amendment rights because teachers cannot "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering*, 391 U.S. at 568.  In such instances, courts must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*  The Supreme Court therefore held that "absent proof of false statements knowingly or recklessly made by [a teacher], a teacher's exercise of [the] right to speak on issues of public importance may not furnish the basis for [the teacher's] dismissal from public employment." *Id.* at 574.

been subjected to regulations governing the licensing of professional investigators based on his conduct as a member of the profession for which he seeks a license. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 421, 426 (2006) ("We reject . . . the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."). The analysis set forth in *Pickering* is, therefore, inapposite.

[¶18] Because of the power of government to regulate conduct, governmental authority "to regulate the professions is not lost whenever the practice of a profession entails speech." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 109 (4th Cir. 2018) (quotation marks omitted). "States may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs. [NIFLA] v. Becerra*, 138 S. Ct. 2361, 2372 (2018). The State "bears a special responsibility for maintaining standards among members of the licensed professions" and "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 460 (1978).

[¶19] Occupational licensing requirements are not categorically exempt from First Amendment scrutiny, however, *see Vizaline, L.L.C. v. Tracy*, 949 F.3d

927, 934 (5th Cir. 2020), and the Supreme Court has signaled that professional speech does not fall into a unique category that is exempt from First Amendment protections, *see NIFLA*, 138 S. Ct. at 2373-75. The pertinent standard for determining whether a regulation governing entry into a profession violates the First Amendment has become a subject of some confusion throughout the United States.

[¶20] Following the issuance of *Lowe v. Securities and Exchange Commission* in 1985, many courts cleaved to the standard set forth in Justice White's concurring opinion in that matter: "Regulations on entry into a profession, as a general matter, are constitutional if they have a rational connection with the applicant's fitness or capacity to practice the profession." 472 U.S. 181, 228 (1985) (White, J., concurring) (quotation marks omitted); *see, e.g.*, *Hines v. Alldredge*, 783 F.3d 197, 201-02 & n.17 (5th Cir. 2015), *abrogation recognized by Vizaline,* 949 F.3d at 933-34; *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Howell*, 851 F.3d 12, 16, 19-20 (D.C. Cir. 2017) (applying rational basis review to restrictions on who may appear as counsel before a local federal court); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Castille*, 799 F.3d 216, 221 (3d Cir. 2015) ("It has long been true that [a] State can require high standards of qualification, such as good moral character

12

or proficiency in its law, before it admits an applicant to the bar, so long as any requirement has a rational connection with the applicant's fitness or capacity to practice law." (alteration in original) (quotation marks omitted)).

[¶21] Because, however, the Supreme Court held in 2018 that it has never recognized "professional speech as a unique category that is exempt from ordinary First Amendment principles," *NIFLA*, 138 S. Ct. at 2375, it is unclear whether the "rational connection" test is appropriately applied even as to standards of qualification to practice a profession, *see Vizaline,* 949 F.3d at 934 ("While we hold the district court erred by categorically exempting occupational-licensing requirements from First Amendment scrutiny, we express no view on what level of scrutiny might be appropriate for applying Mississippi's licensing requirements to [the plaintiff]'s practice.").

[¶22] The Supreme Court *has* made clear that if regulations impose *content-based* restrictions on speech, strict scrutiny or intermediate scrutiny may be applied, depending on whether the affected speech was commercial speech. *See NIFLA*, 138 S. Ct. at 2374-75; *Otto v. City of Boca Raton*, 981 F.3d 854, 859-68 (11th Cir. 2020) (applying strict scrutiny to an ordinance prohibiting sexual orientation change therapies because the ordinance imposed content- and viewpoint-based restrictions on speech); *see also Holder*

*v. Humanitarian L. Project*, 561 U.S. 1, 27-28 (2010) (stating that although a law may be directed at conduct, the conduct triggering the application of that law may consist of communicating a particular message and therefore may require a court to apply First Amendment principles).[6]

[¶23] The treatment of regulations governing the licensing of professionals that place a merely incidental burden on speech is, however, unclear. Free speech concerns are implicated in such cases because "constitutional violations may arise from the deterrent, or chilling, effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights." *Umbehr*, 518 U.S. at 674 (alteration in original) (quotation marks omitted) (explaining that "unconstitutional conditions" may not be placed on government benefits).[7] However, it is unclear whether such regulations are subject to the "rational connection" test, *see Lowe*, 472 U.S. at

---

[6] Before *National Institute of Family & Life Advocates* [*NIFLA*] *v. Becerra*, 138 S. Ct. 2361, 2372 (2018), some intermediate level of scrutiny was applied in reviewing content-based standards governing attorney conduct that included "actual malice" language prohibiting a lawyer from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications, integrity, or record of a judge." *Standing Comm. on Discipline of the U.S. Dist. Ct. v. Yagman*, 55 F.3d 1430, 1437 (9th Cir. 1995) (quotation marks omitted) (applying an objective test of whether the attorney "had a reasonable factual basis for making the statements, considering their nature and the context in which they were made"); *In re Dixon*, 994 N.E.2d 1129, 1132-37 (Ind. 2013) (same).

[7] "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

228 (White, J., concurring), or must survive intermediate scrutiny, meaning that they "must be narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (quotation marks omitted). The Supreme Court did not decide the question in *NIFLA*, 138 S. Ct. at 2373-75, but a handful of courts have since opined on the issue.

[¶24] The United States Court of Appeals for the Fourth Circuit recently considered a North Carolina ban on the practice of law by corporations—a professional regulation that incidentally affected speech. *Capital Associated Indus. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019). As that court stated, "Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than restrictions on speech." *Id.* at 207-08.

[¶25] The court held that the practice of law involved both communicative and noncommunicative aspects and that the pertinent statutes did not target "the communicative aspects of practicing law, such as the advice lawyers may give to clients" but instead focused on who may act as a lawyer. *Id.* at 208. "Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession." *Id.*

[¶26]  The court observed that, although intermediate scrutiny ordinarily applies to regulations of conduct that incidentally impact speech, "the [Supreme] Court's cases have not been crystal clear about the appropriate standard of review" given that regulations relating to admission to a profession fall in "an area in which [the Court] 'has afforded *less* protection for professional speech.'"  *Id.* (quoting *NIFLA*, 138 S. Ct. at 2372); *see also AMA v. Stenehjem*, 412 F. Supp. 3d 1134, 1148-49 (D.N.D. 2019) (following *Stein*).  The court concluded, however, that intermediate scrutiny should be applied, stating, "We think this a sensible result, as it fits neatly with the broad leeway that states have to regulate professions."  *Stein*, 922 F.3d at 209; *but see Doyle v. Palmer*, 365 F. Supp. 3d 295, 304-05 (E.D.N.Y. 2019) (holding that the requirement of a sponsor's affidavit for Bar admission "is nothing more than a standard regulation of the legal profession that . . . passes rational basis review").

[¶27]  Confronting the question of the proper level of scrutiny, another court described the legal ambiguity as follows:

> [T]he Court in *NIFLA* explained that a lower level of scrutiny should be applied to two kinds of content-neutral restrictions: (1) laws that require professionals to disclose factual, noncontroversial information in their commercial speech[]; and (2) *regulations of professional conduct that incidentally burden speech*.  Although the Court in *NIFLA* did not specifically state what level of review—how much lower than strict scrutiny—applied to regulations of

professional conduct that incidentally burden speech, the Court appeared to apply intermediate scrutiny.

*McLemore v. Gumucio*, No. 3:19-cv-00530, 2020 U.S. Dist. LEXIS 228082, at *59 (M.D. Tenn. Dec. 4, 2020) (emphasis added) (quotation marks omitted) (citation omitted). That court, citing *Stein*, 922 F.3d at 209, assumed for purposes of deciding a motion to dismiss that intermediate scrutiny would apply if the merits were reached. *Id.* at *60-61.

[¶28] In light of *NIFLA* and *Stein*, we similarly conclude that intermediate scrutiny is the proper test to apply when a regulation of conduct that does not explicitly target speech but incidentally burdens it is challenged on First Amendment grounds.[8] Here, the licensing standards, requiring good character and competency in investigating matters, do not on their face prohibit or constrain speech. *Cf. NIFLA*, 138 S. Ct. at 2372. The licensing statutes incidentally affect an applicant's speech, however, because determining whether an applicant meets the requirements of good character and competency may depend—as it does here—upon the applicant's communications. *See id.*; 33 M.R.S. §§ 8105(4), 8113(6). We therefore apply

---

[8] Although we apply intermediate scrutiny based on our reading of *NIFLA*, 138 S. Ct. at 2370-75, applying the less stringent "rational connection" test would yield the same result, *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring) (quotation marks omitted).

intermediate scrutiny to review the Department's application of the licensing statutes to Gray's application.

2.      Application of Intermediate Scrutiny

[¶29]  Unlike a determination of actual malice, which "involve[s] legal, as well as factual, elements," and requires an independent examination of the record, intermediate scrutiny does not involve that level of review, and we will accept the facts found by the Department unless they are unsupported by evidence in the record.  *Hernandez v. New York*, 500 U.S. 352, 367-68 (1991); *see Palian*, 2020 ME 131, ¶ 10, 242 A.3d 164.  Thus, we proceed to (a) review the findings of the Department and (b) apply intermediate scrutiny to the licensing standards as applied.

a.      Review of Findings

[¶30]  We review the decision of the Department to determine whether its findings are "supported by substantial evidence in the record."  *Palian*, 2020 ME 131, ¶ 10, 242 A.3d 164 (quotation marks omitted).

[¶31]  In its final decision, the Department specifically found that Gray made uninvestigated and false statements, using the social media account of his investigation business, in which he suggested that the lieutenant was intoxicated; stated that the lieutenant had "murdered," "executed," or "killed" a

woman; and indicated that the lieutenant had been subject to multiple complaints filed with the OPS. Gray admitted, through his responses to the Department's written questions, that the statements, which were made part of the evidentiary record, were his.

[¶32]  Substantial evidence in the record supports the Department's determination that Gray used a social media account bearing his investigation business's name to repeatedly publicize uninvestigated and false statements. The evidence also supports the Department's ultimate finding that Gray's behavior demonstrated that he lacked the necessary good character and competency to serve as an investigator in Maine.  *See* 32 M.R.S. § 8105(4) (requiring the demonstration of "good moral character"); *id.* § 8113(6) (authorizing the denial of a professional investigator's license if the applicant lacks competency to carry out the duties of an investigator); *id.* § 8103(4-A)(A), (B) (establishing a professional investigator's role in investigating the crimes, conduct, reputation, or character of others).  The record also supports the Department's finding that Gray's responses to the questions propounded on him demonstrated a lack of capacity to distinguish between fact and opinion— an ability that a professional investigator must possess.  *See id.* § 8113(6)(B). The Department therefore did not err in its findings.

### b. Intermediate Scrutiny of the Licensing Standards as Applied

[¶33]   The question before us is whether the statutory licensing standards, as applied in Gray's case, were "narrowly tailored to serve a significant governmental interest." *Packingham*, 137 S. Ct. at 1736 (quotation marks omitted); *see NIFLA*, 138 S. Ct. at 2372.

[¶34]   The Department denied the license application because, as the record supports, Gray published uninvestigated speculation as fact using his job title and the name of his Massachusetts private investigation business—conduct that demonstrated a lack of capacity to distinguish between fact and opinion, and to investigate and honestly report facts.   *See* 32 M.R.S. §§ 8103(4-A)(A), (B), 8105(4), 8113(6); *see also Office of Pro. Regul. v. McElroy*, 824 A.2d 567, 568-69, 571 (Vt. 2003).   The government has a significant interest in maintaining standards of good character and competency for those who investigate and report on the intimate details of others' lives. *See* 32 M.R.S. § 8103(4-A)(A), (B); *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 625 (1995) ("States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for

licensing practitioners and regulating the practice of professions." (quotation marks omitted)).

[¶35] The Department denied Gray's application not because of the viewpoint he expressed on social media but because of the false, uninvestigated information that Gray presented as fact using the name of his Massachusetts private investigation business. The Department's rationale for its decision goes to the heart of professional responsibility concerns and does not chill any speech other than that which would, for a professional investigator, violate standards of conduct in a profession that is focused on the investigation and accurate communication of facts. *See In re R. M. J.*, 455 U.S. 191, 203 (1982) (holding that, when a state regulates in a way that affects speech, it must have "a substantial interest and the interference with speech must be in proportion to the interest served"). The Department's application of the statutes was, therefore, narrowly tailored to serve the significant governmental interest in maintaining standards for licensing professional investigators, who are responsible for researching and reporting on some of the most consequential details of people's lives by investigating "[t]he identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character" of others. 32 M.R.S. § 8103(4-A)(A), (B); *see Packingham*, 137 S. Ct.

at 1736. In short, the Department's application of the licensing standards to Gray did not violate the First Amendment.

The entry is:

Judgment affirmed.

---

Roger L. Hurley, Esq. (orally), Camden, for appellant Joshua A. Gray

Aaron M. Frey, Attorney General, and Kent Avery, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for cross-appellant Department of Public Safety

Kennebec County Superior Court docket number AP-2019-49
FOR CLERK REFERENCE ONLY