MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2021 ME 28
Docket:      Ken-20-163
Argued:      February 9, 2021
Decided:     May 13, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STEPHEN DOANE

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

CONNORS, J.

[¶1]  Stephen Doane, MD, appeals from a judgment of the Superior Court (Kennebec County, *Murphy, J.*) affirming, pursuant to M.R. Civ. P. 80C and 5 M.R.S. § 11007(4)(A) (2021), a decision by the Department of Health and Human Services excluding him from participation in and reimbursement from Maine's Medicaid program, MaineCare.  We affirm the decision of the Superior Court.

I.  BACKGROUND

[¶2]  The following facts are drawn from the Department's final decision, which adopted the findings of fact made by the presiding hearing officer in his recommended decision, and the procedural facts are taken from the court's

2

record. *See Palian v. Dep't of Health and Hum. Servs.*, 2020 ME 131, ¶ 3, 242 A.3d 164.

A.     The Board's 2015 Censure Decision and 2012 Consent Agreement

[¶3]   On March 10, 2015, Dr. Doane was censured by the Board of Licensure in Medicine based on his prescription practices leading up to the death, by apparent overdose, of a patient in May 2012.[1]

[¶4]  Although the Board voted to allow Dr. Doane to retain his medical license, it imposed serious restrictions on his ability to practice medicine.  He was required to have a "practice monitor" review all of the cases in which he prescribed controlled substances and report to the Board every four months.

[¶5]  These restrictions were in addition to previous restrictions imposed by a 2012 consent agreement following the death of a different patient who, in 2011, had also died of an apparent drug overdose.  In entering that consent agreement, Dr. Doane conceded that the conduct at issue, "if proven, could

---

[1] By unanimous vote, the Board found that Dr. Doane had failed to conduct all required aspects for evaluation of the patient; failed to create a written treatment plan; failed to discuss with the patient the risks and benefits of the use of controlled substances; failed to implement a written agreement outlining patient responsibilities, including urine/medication serum level screening, pill counts, the number and frequency of all prescription refills, and the reasons for which drug therapy would be discontinued; and failed to keep accurate and complete medical records.  The Board unanimously found that Dr. Doane demonstrated incompetence in his treatment of the patient and, by a five-to-one vote, found that he had committed unprofessional conduct by failing to appropriately follow up on and respond to information obtained from other doctors and reporters, as well as from events that occurred in his own office, regarding his patient's overdose on the medications that he had prescribed.

constitute grounds for discipline and the denial of his application to renew his Maine medical license for unprofessional conduct pursuant to 32 M.R.S. § 3282-A(2)(F)."[2]  Pursuant to the consent agreement, among other things, he could "no longer prescribe controlled medications for pain, including all opioids and benzodiazepines, except for patients in skilled nursing facilities or long-term care facilities, patients in hospice care, or patients with metastatic cancer."

B.    The Department's 2015 Decision to Terminate Dr. Doane's Participation in MaineCare

[¶6]   In a letter dated April 9, 2015, approximately one month after Dr. Doane's censure and the imposition of additional restrictions by the Board, the Department notified him that it was terminating his participation in medical assistance programs, most significantly for this appeal, MaineCare.[3]   The

---

[2]  The consent agreement recited that the Board had sufficient evidence from which it could conclude that Dr. Doane failed to adhere to the Board's rules on the use of controlled substances for treatment of pain by "failing to obtain patient A's previous medical records prior to prescribing controlled medications to patient A; failing to access and review the [prescription monitoring program] prior to prescribing the amount and dosage of controlled medications to patient A; failing to recall the telephone message regarding patient A and her recent hospitalization and accompanying respiratory distress prior to prescribing medications to patient A; and increasing the dosage (doubling), frequency, and total amount (doubling) of narcotics prescribed to patient A only four days after initially prescribing fifteen days' worth of narcotics to patient A, which was done without obtaining patient A's previous medical records or reviewing the [prescription monitoring program]."

[3]  Because the basis for termination was grounded in state and federal Medicaid and MaineCare regulations, and no other program has been identified by the parties on appeal, we do not discuss further any other medical assistance programs.

4

Department stated that it took this action pursuant to the MaineCare Benefits Manual, 10-144 C.M.R. ch. 101, ch. I, §§ 1.03-6, 1.19-1, 1.19-3 (effective January 1, 2014),[4] and the "authority granted [to it] in the Code of Federal Regulations." The Department relied specifically on section 1.19-1(M), (O), and (R) of the Manual, which provides for sanctions based on the violation of any law, regulation, or code of ethics governing the conduct of occupations or professions of regulated industries; failure to meet standards required by state or federal law for participation; and formal reprimand or censure by an association of the provider's peers for unethical practices. *See id.* § 1.19-1(M), (O), (R).[5]

[¶7] Dr. Doane requested an informal review of the termination decision, which is the first step of the multi-tiered framework for an administrative appeal under the Manual. *See id.* § 1.21;[6] *Palian*, 2020 ME 131, ¶ 5, 242 A.3d 164. The Department affirmed its decision by a letter dated September 11, 2015.

---

[4] The locations of various MaineCare Benefits Manual sections have changed during the time relevant to this appeal, but no such changes impact this appeal. The parties do not contend that any changes in the Manual affect our analysis. The relevant sections are currently located at 10-144 C.M.R. ch. 101, ch. I, §§ 1.03-10, 1.20-1, 1.20-3 (effective Sept. 17, 2018).

[5] Currently located at 10-144 C.M.R. ch. 101, ch. I, § 1.20-1(M), (O), (R) (effective Sept. 17, 2018).

[6] Currently located at 10-144 C.M.R. ch. 101, ch. I, § 1.23 (effective Sept. 17, 2018).

C.  *Doane I*

[¶8]  On September 23, 2015, Dr. Doane filed a complaint in the Superior Court seeking a declaratory judgment that the Department lacked jurisdiction to terminate his MaineCare participation and contending that the District Court—not the Department—had exclusive jurisdiction over licensing decisions pursuant to 4 M.R.S. § 152(9) (2021) and M.R. Civ. P. 80G.  The Superior Court agreed with Dr. Doane that the Department lacked jurisdiction, and the Department's administrative proceedings were stayed pending the resolution of the Department's appeal of the Superior Court's decision.  *Doane v. Dep't of Health & Hum. Servs.*, No. CV-15-168, 2016 Me. Super. LEXIS 125, at *3 (June 30, 2016).

[¶9]  On appeal, we ruled that the Department had jurisdiction.  *See Doane v. Dep't of Health & Hum. Servs.*, 2017 ME 193, ¶¶ 31-32, 170 A.3d 269 (*Doane I*).  In so concluding, we noted "the functional distinctions between a [Board] license revocation and a [Department] termination of participation in a program through a provider agreement."  *Id.* ¶ 29.

D.  Further Administrative and Judicial Review of the Department's Decision

[¶10]  With the administrative process revived after the issuance of *Doane I*, in 2018, the presiding officer for the Department issued his

recommendation following an evidentiary hearing that had been held in 2016 prior to the stay. In his findings of fact, the presiding officer acknowledged the Board's previous findings of serious professional deficiencies but nevertheless recommended reversal of the Department's decision to terminate Dr. Doane's participation in MaineCare.

[¶11] The acting Commissioner disagreed with the presiding officer's recommendation. In a decision dated October 10, 2018, the acting Commissioner stated:

> I hereby adopt the findings of fact but I do NOT accept the Recommendation of the Hearing Officer. Instead, for the reasons set forth below, I find that the Department was correct when it terminated Stephen Doane, M.D., from participation in the MaineCare program.
>
> Pursuant to the MaineCare Benefits Manual, Chapter I, section 1.19-2(A), the Department has independent authority to exclude a provider from participation in the MaineCare program based on its consideration of factors set forth in section 1.19-3(A)(1). This authority arises out of the Department's administration of the MaineCare program which provides reimbursement for medical services provided to vulnerable low-income, disabled, and high-risk populations. The Department properly exercised its authority to exclude Dr. Doane from participation in the MaineCare population by basing the exclusion on the undisputed serious and multiple incidents of professional incompetence by Dr. Doane over an extended period of time as set forth in [the Board's censure decision and preceding consent agreement].

[¶12]  On November 9, 2018, Dr. Doane filed a Rule 80C petition in the Superior Court.  The court affirmed the Department's decision, and Dr. Doane timely appealed.  *See* 5 M.R.S. § 11008 (2021); M.R. App. P. 2B(c).

## II.  DISCUSSION

[¶13]   Dr. Doane argues the following: (1) the Legislature did not articulate sufficient guidance when it delegated authority to the Department to regulate MaineCare pursuant to 22 M.R.S. § 42 (2021) and 22 M.R.S. § 3173 (2021); (2) the Department's decision to exclude him is precluded by the Board's decision not to withdraw or suspend his license; (3) there was insufficient evidence to support the Department's final decision; and (4) the acting Commissioner provided insufficient reasoning for her decision.

[¶14]  We disagree.

A.     Standard of Review

[¶15]   "When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review the administrative agency's decision directly for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record."  *Manirakiza v. Dep't of Health & Hum. Servs.*, 2018 ME 10, ¶ 7, 177 A.3d 1264 (quotation marks omitted).  "We review questions of law de novo," *Palian*, 2020 ME 131, ¶ 10, 242 A.3d 164, but

8

we will not substitute our judgment for that of the Department, *AngleZ Behav. Health Servs. v. Dep't of Health & Hum. Servs.*, 2020 ME 26, ¶ 12, 226 A.3d 762.

B.     Vagueness and Excessive Delegation

[¶16]     Dr. Doane first argues that the statutes authorizing the Department's action are insufficiently specific.   This argument invokes two constitutional doctrines—that a statute is void if it is too vague or if it delegates too much authority to the administering body.   While these concepts overlap, *see Uliano v. Bd. of Env't Prot.*, 2009 ME 89, ¶ 15, 977 A.2d 400, they have different sources of authority and emphases.

[¶17]  A goal of both doctrines is to avoid arbitrary decision-making.  *See Lentine v. Town of St. George*, 599 A.2d 76, 78 (Me. 1991); *Superintending Sch. Comm. v. Bangor Educ. Ass'n.*, 433 A.2d 383, 387 (Me. 1981).   A "void for vagueness" claim is based on the due process protections set forth in the United States and Maine Constitutions and focuses on the need for adequate notice. *See Town of Baldwin v. Carter*, 2002 ME 52, ¶ 10, 794 A.2d 62 ("[T]hose subject to sanction by law [must] be given fair notice of the standard of conduct to which they can be held accountable." (quotation marks omitted)).   An "excessive delegation" claim is based on the separation of powers clause of the Maine Constitution, which precludes a statutory delegation to a regulator so

broad or amorphous that it amounts to a surrender of legislative authority to the executive branch. *See* Me. Const. art. III § 2; *Lewis v. Dep't of Hum. Servs.*, 433 A.2d 743, 747 (Me. 1981) ("We have consistently endorsed the fundamental constitutional requirement that legislation delegating discretionary authority to administrative agencies must contain standards sufficient to guide administrative action.").

[¶18] Here, Dr. Doane does not complain that he lacked notice as to the type of conduct that would expose him to sanctions, including termination from participation in MaineCare. The Department regulations and Manual are clear. Rather, he argues that the authorizing statutes are too broad, so that the Department improperly acted in a legislative capacity when it issued its regulations. We therefore analyze his claim as asserting excessive delegation.

[¶19] Dr. Doane is correct in noting that the language contained in the authorizing statutes is broad. Title 22 M.R.S. § 42(1) provides:

> The department shall issue rules and regulations considered necessary and proper for the protection of life, health and welfare, and the successful operation of the health and welfare laws. The rules and regulations shall be adopted pursuant to the requirements of the Maine Administrative Procedure Act.

Title 22 M.R.S. § 3173 provides, in relevant part:

> The department is authorized to administer programs of aid, medical or remedial care and services for medically indigent

persons[,] [and] . . . [t]he department is authorized and empowered to make all necessary rules and regulations consistent with the laws of the State for the administration of these programs including, but not limited to, establishing conditions of eligibility and types and amounts of aid to be provided, and defining the term "medically indigent," and the type of medical care to be provided.

[¶20]  At first blush, these statutes seem to provide few limits on the Department's ability to enact whatever regulations it might choose, triggering excessive-delegation concerns.  But a more in-depth review shows that sufficient limitations and safeguards are in place for the statutory framework to pass constitutional muster.

[¶21]  We start with the premise that when evaluating the constitutionality of a statute we "will, if possible, construe [it] to preserve its constitutionality." *Friends of Me.'s Mountains. v. Bd. of Env't Prot.*, 2013 ME 25, ¶ 21, 61 A.3d 689 (quotation marks omitted).

[¶22]  Greater flexibility is also allowed with respect to delegations of authority to state agencies by the acts of the Legislature than to delegations of authority to boards and committees by municipalities. *See Uliano*, 2009 ME 89, ¶ 26, 977 A.2d 400.  This is because the "state's delegation of authority to an executive agency . . . is subject to the Maine Administrative Procedure Act [APA] and its procedural protections." *Id.*  In *Uliano*, we noted that because the Department of Environmental Protection is required to promulgate rules

complying with the APA that are "subject to public notice, modification, and judicial review," these regulatory processes provided significant protection against abuse. *Id.* ¶ 28; *see also Bangor Educ. Ass'n*, 433 A.2d at 387 ("Especially where it would not be feasible for the Legislature to supply precise standards, the presence of adequate procedural safeguards may be properly considered in resolving the constitutionality of the delegation of power."); *State v. Boynton*, 379 A.2d 994, 995 (Me. 1977) ("[T]he presence of adequate procedural safeguards to protect against an abuse of discretion by those to whom the power is delegated compensates substantially for the want of precise guidelines and may be properly considered in resolving the constitutionality of the delegation of power."). The possibility of arbitrary administrative decision-making common to both void-for-vagueness and excessive-delegation concerns is assuaged by the formal APA rulemaking process.

[¶23] Also, because the subject matter of the regulation at issue here concerns public health and safety, a wide amount of rulemaking latitude may be necessary. *See Kovack v. Licensing Bd.*, 157 Me. 411, 418, 173 A.2d 554, 558 (1961) ("As compared to a delegation of authority to regulate businesses generally, the [L]egislature may be less restricted when it seeks to delegate authority of a legislative nature to an administrative body created for a

particular purpose, such as the care of public health." (quotation marks omitted). This point is driven home by two decisions rejecting an excessive-delegation claim involving 22 M.R.S. § 42. *See Lewis*, 433 A.2d 743; *Ne. Occupational Exch., Inc. v. State*, 540 A.2d 1115 (Me. 1988).

[¶24] In *Lewis*, the plaintiff contended that the absence of specific standards within the enabling legislation, section 42, made the Department's adoption of the Maine State Plumbing Code an unconstitutional delegation of authority. 433 A.2d at 746. In rejecting that argument, we considered the entire legislative scheme, noting "that the Department of Human Services is charged with the general responsibility of supervising the interests of health and life of the citizens of the State" and that "[s]uch responsibility quite obviously includes the prevention and control of disease and irresponsible human waste disposal." *Id.* at 746-47 (quotation marks omitted). The delegation of authority to promulgate plumbing and sewage regulations was constitutional because it was contained within a general statutory scheme, was confined to a clearly defined area, and resulted in regulations that were limited to what was necessary and proper. *Id.* at 747-48. We concluded that a legislative delegation is not excessive when "the legislation clearly reveals the purpose to be served by the regulations, explicitly defines what can be

regulated for that purpose, and suggests the appropriate degree of regulation." *Id.* at 748.

[¶25] In *Northeast Occupational Exchange*, we applied this three-part test from *Lewis* to decide whether the Community Mental Health Services Act, 34-B M.R.S. §§ 3601-3606 (1988), was an unconstitutional delegation of authority. 540 A.2d at 1116-17. We rejected the claim that the delegation was unconstitutional, reasoning that the clear purpose of the Act was "to encourage an increased availability of and participation in local community mental health services"; the Act clearly defined the services that could be regulated for that purpose; and, because the rules promulgated under the Act were subject to the APA, there was an appropriate degree of regulation to compensate for the lack of precise guidelines. *Id.*

[¶26] In the instant case, the latitude that the Legislature has bestowed upon the Department is further informed by MaineCare's role within the federal Medicaid framework. As the Manual notes, "The Maine Department of Health and Human Services . . . is responsible for administering MaineCare in compliance with Federal and State statutes[] and administrative policies." 10-144 C.M.R. ch. 101, ch. I, § 1.02-1 (effective Sept. 17, 2018). The federal government appropriates money to Maine to furnish medical, rehabilitation,

14

and other assistance "on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income resources are insufficient to meet the costs of necessary medical services." 42 U.S.C.S. § 1396-1 (LEXIS through Pub. L. No. 116-344). Maine must adhere to federal requirements for the use of the appropriated funds. *See* 42 U.S.C.S. § 1396a (LEXIS through Pub. L. No. 116-344). For instance, federal law requires Maine to "comply with provider and supplier screening, oversight, and reporting requirements," *id.* § 1396a(a)(77), (kk), and to notify the Secretary of Health and Human Services and the state licensing board "whenever a provider of services or any other person is terminated, suspended, or otherwise sanctioned or prohibited from participating under the State plan," *id.* § 1396a(a)(41). As we noted in *Doane I*:

> Some providers, pursuant to the federal Medicaid regulations, must or may be excluded from the Medicaid program by the federal Office of Inspector General. *See* 42 C.F.R. §§ 1001.101, 1001.201–1001.951 (2016). The Inspector General's office must exclude from participating in the Medicaid program providers who have been convicted of certain types of crimes, *see id.* § 1001.101, and *may* exclude from participation providers who have committed other misconduct, including providers who have had their state professional licenses revoked or suspended, *see id.* §§ 1001.201-1001.951. The federal regulations are not to be "construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law." 42 C.F.R. § 1002.2(b) (2016) (redesignated as 42 C.F.R. § 1002.3(b) by 82 Fed. Reg. 4100 § 36 (Jan. 12, 2017)).

2017 ME 193, ¶ 22, 170 A.3d 269 (emphasis in original).[7]

[¶27]  In sum, while the amount of discretion the Legislature can bestow upon a state agency is not boundless, latitude must be given in areas where the statutory enactment of detailed specific standards is unworkable.  When the subject matter is public health, agency regulations are subject to APA review, and the scope of the regulatory authority is limited by context, purpose, and a comprehensive federal regulatory regime.  Department regulations that call for potential exclusion from a medical assistance program based on incompetence and failure to comport with professional standards should not surprise a physician-participant and fall squarely within the goals articulated by the Legislature in the authorizing statutes for the protection of life, health, and welfare; the successful operation of the health and welfare laws; and safe care for the medically indigent population.  *See* 22 M.R.S. § 42(1).

---

[7]  By federal law, generally speaking, individuals eligible for medical assistance under Medicaid may choose any "qualified" provider.  42 U.S.C.S. § 1396a(a)(23) (LEXIS through Pub. L. No. 116-344).  The definition of "qualified" is not included in the federal statute.  Federal regulations provide that states may set "reasonable standards relating to the qualifications of providers," 42 C.F.R. § 431.51(c)(2) (2019), and "qualified" is interpreted to mean capable of performing needed medical services in a professionally competent, safe, legal, and ethical manner, *Planned Parenthood of Ind. Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012).  Thus, states have "considerable discretion" in establishing qualifications based on professional competency and patient care.  *Planned Parenthood of Kan. & Mid-Missouri v. Andersen*, 882 F.3d 1205, 1230 (10th Cir. 2018); *see also Dube v. Dep't of Health & Hum. Servs.*, 97 A.3d 241, 248 (N.H. 2014) (noting that states have "considerable authority" to establish qualifications).

C.      Issue Preclusion

[¶28]    Dr. Doane next contends that the Board made a factual determination that he was competent and met minimum professional standards; that the Department must accept this finding; and that the finding requires the Department to continue his participation in MaineCare.   This argument misapprehends the distinct roles played by the two agencies.

[¶29]   We review de novo whether issue preclusion, also known as collateral estoppel, applies to the Board's decision. *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 7, 940 A.2d 1097.  The doctrine "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding."  *Id.* ¶ 9 (quotation marks omitted).  The doctrine can apply to administrative agencies. *See Fitanides v. Perry,* 537 A.2d 1139, 1140 (Me. 1988) ("Absent a specific contrary statutory provision, an adjudicative determination of a legal or factual issue by an administrative tribunal has the same effect of issue preclusion as a court judgment if the administrative proceeding resulting in that determination entailed the essential elements of adjudication." (quotation marks omitted)). The Restatement (Second) of Judgments § 36 cmt. f (Am. L. Inst. 1982) notes,

however, that "a prior determination that is binding on one agency and its officials may not be binding on another agency and its officials . . . [i]f the second action involves an agency or official whose functions and responsibilities are so distinct from those of the agency or official in the first action that applying preclusion would interfere with the proper allocation of authority between [the two agencies]."

[¶30]  Applying these principles here, we conclude that the Department and the Board serve distinct functions and that the issue decided by the Board was not identical to that before the Department.

1.    Distinct Functions

[¶31]  We noted the differences between the functions of the Board and the Department in *Doane I*, 2017 ME 193, ¶ 29, 170 A.3d 269.  The Board is a licensing authority.  It is composed primarily of physicians, *see* 32 M.R.S. § 3263 (2021), sets standards of practice for physicians, and investigates complaints, *see* 32 M.R.S. § 3269 (2021).  Its investigations of complaints can result in various restrictions on a physician's license or in consent agreements, which are designed both to protect the general public and to rehabilitate or educate the licensee.  *See* 32 M.R.S. § 3282-A(1) (2021).

[¶32]    In contrast, the Department is a procurer of services.    It administers the Medicaid program, among other activities, and is "authorized to administer programs of aid, medical or remedial care and services for medically indigent persons."  22 M.R.S. § 3173.  "To implement the MaineCare program, the Department contracts with health care providers, who bill the Department for MaineCare-covered services pursuant to the terms of those contracts, Department regulations, and federal law."  *AngleZ Behav. Health Servs.*, 2020 ME 26, ¶ 2, 226 A.3d 762; *see* 42 U.S.C.S. § 1396a (LEXIS through Pub. L. No. 116-344).

[¶33]  As we held in *Doane I*, the Board's licensing function is not the same as the Department's procurement function.  2017 ME 193, ¶ 16, 170 A.3d 269.  We noted that "the dispute [in *Doane I*] focuse[d] not on Doane's medical license but on his capacity to participate in and receive compensation from Maine's Medicaid program, MaineCare."  *Id.*   The state exercises its police power to regulate the medical profession on behalf of the general public through the Board's professional licensing.  *Id.* ¶ 29.  The Department's decision-making relates only to those citizens receiving services through MaineCare, and in keeping with that goal, making the best use of state funds received from the federal government.  *Id.* ¶¶ 29-30.

2.      Different Issues

[¶34]  Dr. Doane next argues that in order to determine that he was fit to practice medicine, "the [Board] necessarily had to conclude that in 2015, he was a 'competent and honest practitioner' who satisfied the 'minimum standards of proficiency in the [medical] profession.'"  To support this proposition, he cites 10 M.R.S. § 8008 (2021), which provides:

> The sole purpose of an occupational and professional regulatory board is to protect the public health and welfare.  A board carries out this purpose by ensuring that the public is served by competent and honest practitioners and by establishing minimum standards of proficiency in the regulated professions by examining, licensing, regulating and disciplining practitioners of those regulated professions.  Other goals or objectives may not supersede this purpose.

[¶35]  As a threshold matter, the Board's censure decision includes no affirmative or express finding that Dr. Doane is fit to serve any population, let alone the constituency served under MaineCare.  The Board specifically found that Dr. Doane demonstrated incompetence in his opioid prescription practice and imposed sanctions, although not the sanction of license revocation.  Although we can reasonably infer that the Board implicitly concluded that Dr. Doane could meet minimum standards of proficiency with monitoring, frequent reporting, and a practice limited to certain discrete populations, this

implicit finding is not an issue identical to the Department's determination whether to continue a physician's participation in MaineCare.

[¶36] The Manual lists the grounds for sanctioning a MaineCare provider. *See* 10-144 C.M.R. ch. 101, ch. I, §§ 1.19-1(A)–(Y) (effective Feb. 13, 2011).[8] Most of these grounds for sanction do not involve failure to meet minimum standards of proficiency. *See, e.g.*, *id.* § 1.19-1(A) (fraudulent claims for services); *id.* § 1.19-1(D) (failing to retain or disclose records of services provided to MaineCare members). This is because, as noted above, the Department is concerned with risks to the program as well as risks to the health and safety of the specific population it serves. Grounds for termination cited in the Department's termination decision, section 1.19-1(M), and (R) of the Manual, were met: Dr. Doane violated the standards of his profession and suffered formal censure. The sanctions available to the Department are listed in its regulations, and in determining which sanctions to impose, the Department may consider factors such as the seriousness of the offense, the extent of violations, the history of prior violations, and consideration of whether a lesser sanction would be sufficient to remedy the problem, among

---

[8] This provision is currently located at 10-144 C.M.R. ch. 101, ch. I, § 1.20-1 (effective Sept. 17, 2018).

other factors. 10-144 C.M.R. ch. 101, ch. I, § 1.19-3 (A)(1)(a)–(c), (g) (effective Feb. 13, 2011).[9] Irrespective of any implicit Board finding that, with practice limitations, Dr. Doane met minimum standards for serving certain populations, from the perspective of the interests and regulations, both state and federal, governing the Department's administration of MaineCare, Dr. Doane fell below the Department's standards such that it could choose to terminate him. Although ensuring professional competency is an important consideration in the decision-making of both the Board and the Department, the agencies may make different determinations in accordance with their own standards. *See Grant's Farm Assocs., Inc. v. Town of Kittery*, 554 A.2d 799, 803 (Me. 1989) ("It is therefore often the case that an applicant . . . must simultaneously persuade different agencies that the same or similar standards are met." (citing *Larrivee v. Timmons*, 549 A.2d 744, 747-48 (Me. 1988))).

D.     Substantial Evidence

[¶37]     The Department terminated Dr. Doane's participation in MaineCare based on "undisputed serious and multiple incidents of professional incompetence by Dr. Doane over an extended period of time." Dr. Doane

---

9    This provision is currently located at 10-144 C.M.R. ch. 101, ch. I, § 1.20-3 (effective Sept. 17, 2018).

contends that this determination was not supported by substantial evidence and constituted an abuse of the Department's discretion because the evidence presented at the Department's hearing did not show that he currently poses any risk to MaineCare patients.

[¶38]  We review an "administrative agency's decision directly for legal errors, abuse of discretion, or unsupported factual findings."  *Forest Ecology Network v. Land Use Regul. Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74 (quotation marks omitted).  In conducting such a review, we "do[] not substitute [our] judgment for that of an agency and must affirm findings of fact if they are supported by substantial evidence in the record."  *Int'l Paper Co. v. Bd. of Env't Prot.*, 1999 ME 135, ¶ 29, 737 A.2d 1047.  "Substantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion."  *Richard v. Sec'y of State*, 2018 ME 122, ¶ 21, 192 A.3d 611 (quotation marks omitted).  "Upon review of an agency's findings of fact we must examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did."  *Friends of Lincoln Lakes v. Bd. of Env't Prot.*, 2010 ME 18, ¶ 13, 989 A.2d 1128 (quotation marks omitted).

[¶39]  The Department based its decision to exclude Dr. Doane from the MaineCare program on its determination that serious incidents of professional incompetence occurred over an extended period of time.  This conduct related to Dr. Doane's treatment of a patient between 2003-2012, with particular focus on events in 2012 leading up to his patient's overdose.  The presiding officer found, as the Board had previously, that Dr. Doane had "committed unprofessional conduct," "demonstrated incompetence in his treatment" of a patient who "died of oxycodone and cyclobenzaprine intoxication," and "violated Board Rule Chapter 21, Section III, governing the use of controlled substances for the treatment of pain" with regard to the same patient who died of an overdose.  The presiding officer's findings of fact, which the Department adopted in its final decision, were supported by the testimony of the Department's audit program manager, who issued the initial April 2015 decision excluding Dr. Doane from MaineCare.

[¶40]  The Department's audit program manager testified about the Board's investigation into Dr. Doane's prescription practices leading up to the death of his patient.  He testified that Dr. Doane's patient had been to the emergency room twice as a result of opiate overdoses and that an emergency room doctor treating the patient had informed one of Dr. Doane's partners that

the patient was overmedicated and was taking opiates at dangerous levels. Instead of reducing the patient's medication as the emergency room doctor had recommended, Dr. Doane increased the number of pills he was prescribing to his patient. The Department's witness testified that Dr. Doane's patient died on May 19, 2012, in an accidental death relating to "[o]xy and [cyclobenzaprine] intoxication." He further testified that the Board found that the opiate treatment Dr. Doane provided for his patient demonstrated poor judgment and "decision-making regarding prescriptions that were well outside the standard of care."

[¶41] Based on this evidence, the Department was not compelled to find that it could not terminate Dr. Doane. *See Friends of Lincoln Lakes*, 2010 ME 18, ¶ 14, 989 A.2d 1128 ("The 'substantial evidence' standard does not involve any weighing of the merits of evidence. Instead it requires us to determine whether there is any competent evidence in the record to support a finding.").

[¶42] In the end, Dr. Doane is not contesting the Department's findings—he acknowledges that his conduct fell below professional standards and does not dispute that the Board censured him—a basis for the Department's sanction in its own right. Instead, as he argued with respect to issue preclusion, he asserts that because the Board did not revoke his license based on his

conduct, the Department cannot terminate his participation in MaineCare based on the same conduct. But not only do these two agencies have different functions, just as we do not substitute our judgment for an administrative decision-maker, one agency is entitled to reach a different conclusion based on the same or similar evidence presented to another agency, as long as both conclusions are supported by the record evidence. The Board determined that the appropriate action to take as to Dr. Doane's license based on his conduct was to assign him a practice monitor and impose limitations on his practice. The Department determined that the appropriate action regarding his participation in MaineCare was termination. Each agency acted within the bounds of its discretion.

E.      Sufficient Findings and Conclusions

[¶43]   Finally, Dr. Doane contends that the decision issued by the Department violates the APA because it does not include sufficient findings of fact. *See* 5 M.R.S. § 9061 (2021) ("Every agency decision made at the conclusion of an adjudicatory proceeding shall be in writing or stated in the record, and shall include findings of fact sufficient to apprise the parties and any interested member of the public of the basis for the decision."). The presiding officer's factual findings were comprehensive, and the acting Commissioner adopted

them in toto. Dr. Doane argues that the acting Commissioner's explanation as to why she imposed the sanction of termination based on those findings was too terse.

[¶44] The acting Commissioner's explanation was concise, not deficient. She noted that she accepted the presiding officer's fact-finding, which was based in turn on much of the Board's fact-finding, and stated that her decision was due to "the undisputed serious and multiple incidents of professional incompetence by Dr. Doane over an extended period of time as set forth in" the Board's censure decision and consent agreement. The gravity, number, and length of time over which the violations occurred are relevant factors in determining appropriate sanctions pursuant to the Manual. 10-144 C.M.R. ch. 101, ch. I, § 1.19-3 (A)(1)(a)–(c) (effective Feb. 13, 2011).[10] That the Board did not revoke Dr. Doane's license based on this conduct did not require the Department to provide a lengthy elaboration of its conclusion that the conduct warranted termination under its regulations.

The entry is:

Judgment affirmed.

---

[10] Currently located at 10-144 C.M.R. ch. 101, ch. I, § 1.20-3(A)(1)(a)–(c) (effective Sept. 17, 2018).

Christopher C. Taintor, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, for appellant Stephen Doane

Aaron M. Frey, Attorney General, and Thomas C. Bradley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Maine Department of Health and Human Services

Kennebec County Superior Court docket number AP-2018-74
FOR CLERK REFERENCE ONLY