Docket No. AP-2021-12

FLORA MUGENI,

        Petitioner,

    v.

MAINE DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ET AL.,

        Respondents.

**DECISION**

REC'D CUMB CLERKS OFC
APR 13 '23 AM 11:43

Before the Court is Petitioner Flora Mugeni's Petition for Review of State Agency Action Pursuant to Maine Rule of Civil Procedure 80C. Ms. Mugeni appeals the Final Decision of Respondent Commissioner of the Department of Health and Human Services ("DHHS"), dated April 28, 2021, upholding a Level I Substantiation of Ms. Mugeni. For the following reasons, the Court affirms the Final Decision.

## I. Background

Following an investigation by Adult Protective Services ("APS"), DHHS issued a Notice of Level I Substantiation to Ms. Mugeni on March 4, 2020. (CR 162.) Ms. Mugeni requested a hearing. (CR 68.) Hearing was held before Administrative Hearing Officer Tamra Longanecker on December 15-17, 2020, and January 25-26, 2021. (CR 34.) Ms. Mugeni testified at the hearing, among others. (CR 62, 1914-2039.)

On April 28, 2021, Chief Administrative Hearing Officer Joseph M. Pickering issued the Final Decision. (CR 1.) The Final Decision adopts the findings of fact of Hearing Officer Longanecker's Recommended Decision, which may be summarized as follows. (CR 1.)

Mr. F. was a 62-year-old man diagnosed with intellectual disability and diabetes mellitus. (CR 38.) He was a dependent adult under 22 M.R.S. § 3472(6), and the State of Maine was his guardian. (CR 38.) His public guardian representative was Patrick Bourque of DHHS, and his case manager was Kelsey Best of Waban Projects, Inc. (CR 39.) Mr. Bourque and Ms. Best had worked with Mr. F. for two years prior to August 2019. (CR 39.)

Mr. F. required blood sugar monitoring and three insulin injections each day to manage his diabetes. (CR 39.) Mr. F. determined the dosage of each injection by using a sliding scale to find the dosage that corresponded to a glucometer reading of his blood sugar. (CR 39.) Mr. F. also required a long-acting insulin injection each night. (CR 39.)

Until August 22, 2019, Mr. F. lived alone. (CR 39.) Mr. F. received support from Living Innovations in his home, including supervision of his blood sugar monitoring and insulin usage. (CR 39.) A few weeks before August 22, Living Innovations discharged Mr. F. due to unsanitary conditions in his home. (CR 39.) Mr. Bourque and Ms. Best grew increasingly concerned about Mr. F.'s health and safety. (CR 40.)

On August 20, 2019, Mr. Bourque and Ms. Best met with Mr. Bourque's supervisor and a DHHS crisis worker to discuss a plan to move Mr. F. into a residential setting with more support. (CR 40.) The same day, Ms. Best contacted Angie Marquis, acting CEO and intake coordinator for Residential and Community Support Services ("RCSS"), to seek an opening for Mr. F. in a group home. (CR 40.) Ms. Best sent a description of Mr. F. and his support requirements to Ms. Marquis. (CR 40.)

On August 22, 2019, Mr. F.'s team met Mr. F. at his home and convinced Mr. F. to go to the hospital. (CR 40.) Mr. Bourque reached into Mr. F.'s home and took a bag containing medications from near the door but did not check its contents. (CR 40.) The bag did not contain insulin or a glucometer. (CR 40.)

Later that day, Ms. Marquis told Ms. Best that RCSS had an opening in a group home starting the next day, Friday, August 23. (CR 41.) She told Ms. Best that a nurse would train the group home staff on Mr. F.'s diabetes management needs before he moved into the home. (CR 41.) Ms. Best sent Ms. Marquis Mr. F.'s medication administration record ("MAR") from June 2019, the sliding scale, and a medication list with times. (CR 41.)

After speaking with Ms. Best, Ms. Marquis told Ms. Mugeni, a registered nurse employed by RCSS, that she would need to train the staff at the group home on how to administer insulin. (CR 41.) Ms. Mugeni asked Ms. Marquis for more specific medical information to develop the training but did not indicate she could not perform the training. (CR 41.) Ms. Mugeni was not otherwise part of Mr. F.'s intake process with RCSS. (CR 41.)

Ms. Mugeni became licensed in Maine on October 8, 2018. (CR 41.) Ms. Mugeni had studied diabetes and insulin administration in nursing school. (CR 41.) She had not been employed as a nurse before being hired by RCSS on November 28, 2018. (CR 41.) Between November 2018 and August 2019, she reviewed medication records and trained direct support professionals ("DSPs") to become certified residential medication aides ("CRMAs"). (CR 41.) She was supervised by Claudia Stanley, a registered nurse and co-owner of RCSS. (CR 41.) In August 2019, Ms. Stanley was on medical leave. (CR 46.)

Mr. F. did not transition to the group home on Friday because his blood sugar levels were too high to discharge him from the hospital.[1] On Saturday, August 24, the hospital permitted Mr. F. to discharge himself. (CR 42.) Mr. F. arrived at the RCSS group

---

[1] The hospital had neglected to administer Mr. F.'s insulin before lunch on Friday.

home by ambulance without insulin, without a prescription to refill his insulin, and without a glucometer. (CR 42.) He did have a bag of other medications. (CR 42.)

RCSS assigned Willy Tshibangu, a DSP, to work with Mr. F. when he arrived. (CR 42.) Shortly thereafter, RCSS sent a CRMA, Paul Mukiza, to the home to help with Mr. F.'s transition. (CR 42.) Art Robbins of DHHS Crisis Services ("Crisis") also visited the group home that day to help Mr. F. settle in. (CR 42.)

Mr. F. appeared weak and dizzy when he arrived at the group home. (CR 42.) When Mr. Mukiza saw that Mr. F. did not have doctor's orders or a medication administration record ("MAR"), Mr. Mukiza reached out to Nancy Yombe, a program manager or "pod leader" for RCSS. (CR 43.) Ms. Yombe in turn called Ms. Mugeni, informed her that Mr. F. appeared weak, and asked her to call the group home staff. (CR 43.)

Ms. Mugeni presumed that Mr. F. was the new diabetic client Ms. Marquis had told her about. (CR 43.) Ms. Mugeni instructed the staff to give Mr. F. soda. (CR 43.) She also told the staff to call her if they needed anything. (CR 43.) Ms. Mugeni then texted Ms. Marquis and explained that Mr. F. showed signs of low blood sugar and that the group home staff did not have any instructions regarding Mr. F.'s medications. (CR 43.) Ms. Mugeni asked whether RCSS had prescriptions for him. (CR 43.)

In response, Ms. Marquis sent Ms. Mugeni a MAR from June 2019 and the sliding scale. (CR 43.) Ms. Mugeni briefly reviewed the MAR that day. (CR 43.) Ms. Mugeni stated that the staff would still need doctor's orders, which Ms. Marquis did not have. (CR 43.) Ms. Mugeni stated that she hoped Crisis would help and that she would "keep checking" to see whether Mr. F. needed to return to the emergency room. (CR 43.) Ms. Marquis responded that RCSS may have to take him back to the emergency room,

considering the number of insulin doses he was supposed to receive daily, and that she would update Ms. Mugeni when she heard back from DHHS Crisis. (CR 44.)

At 5:35 p.m. that same day, Saturday, August 24, the hospital faxed doctor's orders to Ms. Marquis, who forwarded them to Ms. Mugeni, Ms. Yombe, and the RCSS group home staff. (CR 44.) Ms. Mugeni did not review the doctor's orders until she returned to work on Monday, August 26. (CR 44.)

When she returned to work on Monday, Ms. Mugeni discovered that the group home staff had failed to obtain insulin with the doctor's orders. (CR 44.) Ms. Mugeni asked Ms. Marquis if Ms. Marquis thought Mr. F. should return to the emergency room to obtain insulin. (CR 45.) Ms. Marquis told Ms. Mugeni to contact Mr. F.'s primary care provider. (CR 45.)

When Mr. F.'s primary care provider's office told her that the doctor would need to see Mr. F. before refilling his insulin, Ms. Mugeni booked the next available appointment at 9:45 a.m. on Tuesday, August 27. (CR 45.) Ms. Mugeni then texted Ms. Marquis to express concern about the lack of insulin and suggest going to the emergency room to get insulin that day. (CR 45.) Ms. Marquis replied that she would reach out to the case manager, and Ms. Mugeni asked Ms. Marquis to keep her updated. (CR 45.) Ms. Mugeni did not hear back or follow up. (CR 45.) Ms. Mugeni left work early that day with permission. (CR 46.)

The following day, Tuesday, August 27, 2019, the group home staff called Ms. Mugeni and told her that Mr. F. had refused to eat or attend his doctor's appointment. (CR 46.) Staff reported that Mr. F. was rolling on the floor without speaking. (CR 46.) Ms. Mugeni texted Ms. Marquis to explain the situation and ask if she should call Crisis. (CR 46.) When Ms. Mugeni told Ms. Marquis that Mr. F. had not had insulin since he left the hospital on Saturday, Ms. Marquis stated that he should go to the emergency room. (CR

46.) Ms. Mugeni also called Ms. Stanley, who suggested that Ms. Mugeni call Crisis to initiate the emergency response. (CR 46-47.) Ms. Mugeni called Crisis and relayed Ms. Stanley's message to Ms. Marquis. (CR 47.) Art Robbins, the responding DHHS Crisis worker, instructed Ms. Mugeni to meet him at the group home immediately. (CR 47.)

After he arrived and discovered there was no glucometer at the group home, Mr. Robbins asked Ms. Mugeni to bring a glucometer. (CR 47.) She obtained a glucometer from a supply in the office that Ms. Stanley provided for training purposes before going to the group home. (CR 47.)

When Ms. Mugeni tested Mr. F.'s blood sugar, the readout reported that it was "High," which meant that the level was too high for the glucometer to measure. (CR 47.) She instructed the house manager to call 911. (CR 47.) Mr. F. stopped breathing before the ambulance arrived and could not be resuscitated. (CR 48.) His cause of death was hyperglycemia with ketoacidosis due to diabetes mellitus. (CR 48.)

From the time Mr. F. left the hospital on Saturday, August 24, until shortly before his death on Tuesday, August 27, no one had checked Mr. F.'s blood sugar levels or administered insulin. (CR 48.) Ms. Mugeni never trained the staff on blood sugar testing or insulin administration. (CR 60.) If Mr. F. had been transported to the hospital up to one hour before his death and received proper medical care, he "probably" would have survived. (CR 48.)

On January 19, 2022, the Court ruled that Ms. Mugeni would be permitted to supplement the record with evidence of the sanctions or lack thereof imposed by DHHS on other individuals involved in the events leading to Mr. F.'s death. The Court issued an Order on April 11, 2022, granting DHHS's Motion to Clarify the Court's previous Order. Accordingly, the record includes the following additional facts: Ms. Best, Mr. Bourque, and Mr. Robbins were not substantiated. Ms. Yombe received a Level II

Substantiation. House Manager "B.A." received a Level I Substantiation, which was reduced to Level II after an administrative hearing. Ms. Marquis received a Level I Substantiation that is currently being appealed pursuant to M.R. Civ. P. 80C.

## II.  Legal Standard

The Superior Court's review of final actions of state agencies is governed by the Maine Administrative Procedure Act, 5 M.R.S. §§ 11001-11008, and M.R. Civ. P. 80C. The court may reverse an agency's decision if the decision is in violation of constitutional or statutory provisions, in excess of statutory authority, made upon unlawful procedure, affected by bias or error of law, unsupported by substantial evidence in the record, or arbitrary or capricious or characterized by abuse of discretion. 5 M.R.S. § 11007(4)(C); *see Goodrich v. Me. Pub. Emps. Ret. Sys.*, 2012 ME 95, ¶ 6, 48 A.3d 212. The court may not substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3). The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501.

## III.  Discussion

Ms. Mugeni appeals the Final Decision on the following grounds: (1) DHHS did not provide expert witness testimony to establish the standard of care applicable to Ms. Mugeni as a registered nurse, (2) the Final Decision is not supported by substantial evidence, (3) Ms. Mugeni was deprived of procedural due process, (4) the Final Decision is arbitrary and capricious, and (5) the Final Decision is affected by bias.

### A. Applicable Standard

Pursuant to 10-149 C.M.R. ch. 1, § 7(1), "[a]ny individual who cares for, supports, or provides services to an individual with intellectual disability or autism" may be subject to the substantiation process. 10-149 C.M.R. ch. 1, § 7(2)(a)(i) provides, in relevant part:

i. A Level I Substantiation reflects a finding by a preponderance of the evidence (based on an APS Investigation and final written findings) that an individual Abused, Neglected, or Exploited an individual with intellectual disability or autism by engaging one or more of the following:

...

4. Intentionally, knowingly, or recklessly causing a threat to the health or welfare of an individual with intellectual disability or autism by physical or mental injury or impairment, deprivation of essential needs, or failure to protect from these;

5. Intentionally, knowingly, recklessly, or negligently engaging in abuse or neglect that results in serious harm to an individual with intellectual disability or autism.

"Abuse" is defined as "the infliction of injury . . . or the intentional, knowing or reckless deprivation of essential needs, through acts or omissions." *Id.* § 1(1). "Neglect" is "a threat to an adult's health or welfare by physical or mental injury or impairment, deprivation of essential needs or lack of protection from these." *Id.* § 1(11).

As a threshold matter, Ms. Mugeni argues that the regulation does not apply to her because she was not a "direct service provider." The regulation does not limit applicability to "direct service providers." It applies to "[a]ny individual who cares for, supports, or provides services to an individual with intellectual disability." *Id.* § 7(1). The finding that Ms. Mugeni provided services to Mr. F. was supported by substantial evidence, including that Ms. Mugeni advised staff on managing Mr. F.'s diabetes, made a primary care appointment on his behalf, told her supervisor that she would keep checking on his well-being, tested his blood sugar, and called Crisis and 911. (CR 61-62, 406, 412, 415.)

Ms. Mugeni also argues that DHHS was required to present expert testimony to establish the applicable standard of conduct for a nurse. This is not a civil medical malpractice action. As explained above, the standard of conduct is supplied by 10-149 C.M.R. ch. 1, § 7. The Court agrees with DHHS that the regulation does not distinguish between individuals based on licensure.

## B. Substantial Evidence

The Final Decision adopted findings of both knowing or reckless conduct under § 7(2)(a)(i)(4) and negligence under § 7(2)(a)(i)(5). (CR 1-3, 61-62.) A finding by the preponderance of the evidence pursuant to either § 7(2)(a)(i)(4) or § 7(2)(a)(i)(5) would be sufficient to uphold a Level I Substantiation.

### i. Knowing or Reckless Conduct under § 7(2)(a)(i)(4)

First, the hearing officers concluded that Ms. Mugeni's failure to train RCSS staff was a knowing or reckless act that threatened Mr. F.'s health and safety, as were her failures to promptly initiate an emergency response or monitor Mr. F.'s blood sugar levels. (CR 61.) Section 7(2)(a)(ii) provides that the terms "knowingly" and "recklessly" have the meanings set forth in 17-A M.R.S. § 35. Thus, "knowingly" is defined as follows:

> A. A person acts knowingly with respect to a result of the person's conduct when the person is aware that it is practically certain that the person's conduct will cause such a result.
>
> B. A person acts knowingly with respect to attendant circumstances when the person is aware that such circumstances exist.

17-A M.R.S. § 35(2). "Recklessly" is defined as follows:

> A. A person acts recklessly with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result.
>
> B. A person acts recklessly with respect to attendant circumstances when the person consciously disregards a risk that such circumstances exist.
>
> C. For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to the person, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

17-A M.R.S. § 35(3).

Ms. Mugeni argues that insufficient evidence was presented regarding her state of mind. To the contrary, Ms. Mugeni testified to learning about diabetes and the

importance of insulin to diabetics in nursing school.[2] (CR 2027.) As evidenced by her text messages to Ms. Marquis, Ms. Mugeni was aware of the risk posed to Mr. F. if they waited until Tuesday to acquire insulin, and she was aware that she could have initiated an emergency response to acquire insulin. (CR 406-415.)

Ms. Mugeni argues that her conduct did not threaten Mr. F.'s health and safety—his lack of insulin did. Ms. Mugeni's failure to train the staff, however, left them unequipped to test Mr. F.'s blood sugar or recognize the signs that Mr. F. needed to go to the emergency room. Her failure to promptly initiate an emergency response when she realized that he would not be able to see his primary care provider until Tuesday left him without insulin for days. Substantial evidence supports a finding that Ms. Mugeni disregarded a risk and that her disregard of the risk was a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation, or that she was practically certain that her conduct would threaten Mr. F.'s health and welfare. The Court will not disturb the finding that Ms. Mugeni knowingly or recklessly caused a threat to Mr. F.'s health or welfare.

### ii. Negligent Conduct under § 7(2)(a)(i)(5)

Because there is substantial evidence to uphold a Level I Substantiation pursuant to § 7(2)(a)(i)(4), the Court need not determine whether there is substantial evidence to uphold substantiation pursuant to § 7(2)(a)(i)(5). Nevertheless, the Court agrees with DHHS that there is also substantial evidence that Ms. Mugeni negligently engaged in abuse or neglect that resulted in serious harm to Mr. F. *See* § 7(2)(a)(i)(5).

---

[2] The Court disagrees that a heightened standard was applied to Ms. Mugeni because she was a nurse. Rather, Ms. Mugeni's education on diabetes and understanding of the medical risks—to which she testified—informed the analysis of her state of mind. The Court finds no error or deficiency on this point.

Section 7(2)(a)(ii) is silent as to the definition of "negligently." Because "negligently" is omitted from the reference to definitions in the criminal code, Chief Administrative Hearing Officer Pickering concluded that the regulation requires a finding of only civil negligence, not criminal negligence. (CR 2.) The Court agrees with this conclusion. Civil negligence consists of four elements: a duty of care, a breach of that duty, causation, and damages. *Murdock v. Thorne*, 2017 ME 136, ¶ 11, 166 A.3d 119.

The hearing officers concluded that Ms. Mugeni breached a duty owed to Mr. F. by failing to ensure that he saw a doctor on Monday and by failing to promptly initiate an emergency response on Tuesday. (CR 61-62.) Whether one person owes a duty to another is a question of law. *Est. of Smith v. Cumberland County*, 2013 ME 13, ¶ 17, 60 A.3d 759. When acting in an appellate capacity pursuant to M.R. Civ. P. 80C, the Court reviews questions of law de novo. *Doane v. Dep't of Health and Hum. Servs.*, 2021 ME 28, ¶ 15, 250 A.3d 1101.

The hearing officers concluded that Ms. Mugeni owed a duty to Mr. F. because of her role in RCSS and her involvement in his diabetes management, which began when she first rendered advice to the staff to give Mr. F. soda and continued until his death. (CR 61-62.) The Court agrees with the hearing officers' conclusion that Ms. Mugeni owed a duty of care to Mr. F. *See* Restatement (Second) of Torts §§ 323, 324 (Am. L. Inst. 1965) (on negligent performance of undertaking to render services and duty of one who takes charge of another who is helpless).

Breach and causation are questions of fact. *Est. of Smith*, 2013 ME 13, ¶ 17, 60 A. 3d 759. The Final Decision contains findings of both elements, and the Court agrees that the findings are supported by substantial evidence. Ms. Mugeni breached a duty by failing to ensure that Mr. F. received insulin on Monday and by failing to call 911 on Tuesday when she was first informed of his condition. Deprivation of insulin for several days

caused Mr. F.'s death, which "probably" could have been avoided if he had received medical attention up to one hour before his death. (CR 48.)

In sum, the Final Decision is supported by substantial evidence. Ms. Mugeni's Level I Substantiation was properly upheld pursuant to § 7(2)(a)(i)(4) and § 7(2)(a)(i)(5).

## C. Due Process

Generally, procedural due process requires notice and an opportunity to be heard. *Doe v. Tierney*, 2018 ME 101, ¶ 17, 189 A.3d 756. Ms. Mugeni argues that she was denied procedural due process because she was not interviewed during the investigation into Mr. F's death and because she was not given adequate notice of DHHS's allegations related to negligent conduct.

### i. Notice

Ms. Mugeni argues that she was not given adequate notice that her substantiation was based in part on negligent conduct under 10-149 C.M.R. ch. 1, § 2(i)(a)(5) because the report on the Department's investigation contains only the "knowingly or recklessly" language in its "Conclusion Narrative" section. (CR 188-89.) The Court does not agree. The immediately preceding "Conclusions" section indicated that her substantiation was based on § 2(i)(a)(4) and § 2(i)(a)(5), with the language of each section reproduced therein. (CR 188.)

Additionally, the Law Court has held that a party asserting a due process violation based on deficient notice must show that he or she was prejudiced by the deficiency. *Knoblach v. Morris*, 2017 ME 116, ¶ 3, 164 A.3d 132; *Hopkins v. Dep't of Human Servs.*, 2002 ME 129, ¶ 13, 802 A.2d 999. Even if Ms. Mugeni did not receive adequate notice, she has not shown that she was prejudiced by the deficiency. She has not, for example, explained how the asserted deficiency in the notice affected her ability to prepare her defense.

### ii. Hearing

Ms. Mugeni was provided with a meaningful opportunity to be heard at the administrative hearing before Hearing Officer Longanecker. The fact that she was not interviewed during the investigation did not affect her ability to present a defense at the hearing through her own testimony and exhibits. Moreover, APS's own rules and regulations give APS discretion to interview alleged perpetrators of abuse and neglect, "as appropriate." 10-149 C.M.R. ch. 1, § 4(2)(c)(iii). Ms. Mugeni has not demonstrated a due process violation.

### D. Arbitrary and Capricious

Ms. Mugeni argues that the Final Decision was arbitrary and capricious because the hearing officers mischaracterized her role within RCSS and failed to consider whether others were more responsible for Mr. F.'s diabetes management. A reviewing court will "not find that an administrative agency has acted arbitrarily or capriciously unless its action is 'wilful and unreasoning' and 'without consideration of facts or circumstances.'" *AngleZ Behav. Health Servs. v. Dep't of Health and Hum. Servs.*, 2020 ME 26, ¶ 23, 226 A.3d 762 (quoting *Cent. Me. Power Co. v. Waterville Urb. Renewal Auth.*, 281 A.2d 233, 242 (Me. 1971)).

To the contrary, the hearing officers expressly considered that Ms. Mugeni's role typically involved reviewing medical records and training duties.[3] Her substantiation was upheld based in part on her failure to train the CRMAs and DSPs on Mr. F.'s medical needs. (CR 61.) Additionally, the hearing officers found that although her role did not ordinarily involve providing direct services to clients, she had involved herself in Mr. F.'s medical care by advising RCSS staff with respect to his diabetes management. (CR 61-62.)

---

[3] Ms. Mugeni objects to the admission of RCSS job descriptions. Hearing Officer Longanecker, however, explicitly declined to assign any weight to RCSS's job descriptions. (CR 37.)

The fact that others involved in Mr. F.'s care, including DHHS employees, owed a greater duty to Mr. F. or had a greater ability to direct Mr. F.'s medical care does not bear on Ms. Mugeni's own conduct. Omission of discussion of others' conduct in the Final Decision was not unreasonable because the issue to be decided was whether the evidence supported Ms. Mugeni's substantiation.

The hearing officers fully considered the relevant facts and circumstances surrounding Mr. F.'s care and Ms. Mugeni's conduct. The Final Decision is not arbitrary and capricious.

### E. Bias

Ms. Mugeni argues that the Final Decision was affected by bias. State agencies are entitled to a presumption that administrative decision makers act with integrity and objectivity. *New Eng. Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 448 A.2d 272, 279 (Me. 1982); *Mallinckrodt v. Littell*, 616 F. Supp. 2d 128, 142 (D. Me. 2009); *see Friends of Me.'s Mts. v. Bd. of Env't Prot.*, 2013 ME 25, ¶ 23, 61 A.3d 689 ("In order to show bias, however, Friends must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators, acted in good faith.").

To rebut the presumption, Ms. Mugeni points to the fact that several others involved in the incident, including DHHS employees, received a Level II Substantiation, were not substantiated, or were not investigated. She suggests that DHHS employees involved in the initial investigation were biased and that DHHS used Ms. Mugeni as a scapegoat to insulate DHHS employees from discipline.

Although a biased investigation could lead to development of a biased record, Ms. Mugeni was permitted to and did, in fact, present her own evidence for consideration at a de novo hearing. The hearing officers expressly considered her evidence and arguments

in the Recommended Decision and Final Decision. Ms. Mugeni has failed to demonstrate that any bias in the investigation affected the Final Decision.

Nor has Ms. Mugeni demonstrated that either hearing officer's independence was compromised. This case is therefore distinguishable from *Mutton Hill Estates, Inc. v. Town of Oakland,* in which planning board members met, ex parte, with opponents of a project to write factual findings denying the application for a project. 468 A.2d 989 (Me. 1983).

The Court acknowledges that there is evidence in the record that others who were aware of Mr. F.'s medical needs also failed to ensure the Mr. F. received insulin or medical attention when they had the opportunity. That others received lesser sanctions does not establish, standing alone, that the Final Decision was affected by bias. Ms. Mugeni's own Level I Substantiation is supported by substantial evidence. Ms. Mugeni has not overcome the presumption of integrity and objectivity.

## IV. Conclusion

For the foregoing reasons, each of Ms. Mugeni's arguments on appeal fails. The Court denies Ms. Mugeni's Petition.

The entry is:

Petitioner Flora Mugeni's Petition for Review of State Agency Action is DENIED. The Final Decision is AFFIRMED.

The Clerk is directed to incorporate this Decision into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: 4/13/23

MaryGay Kennedy, Justice
Maine Superior Court

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-21-12

FLORA MUGENI,

      Petitioner

v.

      ORDER

REC'D CUMB CLERKS OF
JAN 20 '22 AM9:12

MAINE DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

      Respondent

Before the court is a motion by respondent Department of Health and Human Services to seal the record. This motion is opposed by Petitioner Flora Mugeni.

The basis of the motion is 22 M.R.S. § 3474(1) which provides that records containing personally identifying information created in connection with the department's adult protective activities and activities related to an adult while under the jurisdiction of the department are confidential.

Under § 3474(3)(B), however, the department

> shall disclose relevant information to the court on its finding that access to those records may be necessary for the determination of any issue before the court. Access must be limited to in camera inspection unless the court determines that disclosure of the information is necessary for the resolution of an issue pending before it.

In this case DHHS skipped the steps of having the court determine that access may be necessary for the determination of an issue before the court and of submitting records for in camera inspection. Instead, it simply filed the administrative record. With some exceptions, the administrative record identifies the individual in question as "Mr. F" or redacts his name with the exception of the first letter of his last name. *See. e.g.,* R. 192. There

are, however, a few apparently inadvertent references in the administrative record where the full name is disclosed.

To cut to the chase, the court determines that disclosure of the information in the administrative record – with the exception of Ms. F's full last name – is necessary to the resolution of the appeal under 22 M.R.S. § 3474(3)(B). That means the administrative record shall not be sealed; the court is unwilling to make decisions on a secret record. The principle that court proceedings are open to the public is a fundamental tenet of our judicial system, protected by both the common law and the First Amendment. *Nixon v. Warner Communications.*, 435 U.S 589, 597 (1978); *FTC v. Standard Financial Management*, 830 F.2d 404, 408 & n.4 (1st Cir. 1987).

The court does not, however, see any reason why the full name of the individual in question needs to be disclosed or why he cannot be described as "Mr. F". or "the resident."[1] Because § 3474 aims to protect identifying information of adults under DHHS jurisdiction, the Department shall be allowed, if it chooses, to replace unabbreviated uses of Mr. F.'s last name with the abbreviated version. In that case the Department shall be allowed to reclaim the administrative record, substitute the necessary pages, provide copies of the substituted pages to counsel for petitioner, and refile the record.

Ms. Mugeni's filings to date demonstrate that the full name is not necessary for her to litigate the case. In briefing the appeal, therefore, both parties shall refer to the individual as "Mr. F" or " the resident." This is consistent with the identification of the individual throughout most of the administrative record

---

[1] Ms. Mugeni's motion to take additional evidence does not identify the individual by name but refers to him as "the resident." Her complaint refers to him as "John Doe."

2

The entry shall be:

Respondent's motion to seal the record is denied except that, as set forth above, respondent shall be permitted, if it chooses, to redact any references in the administrative record that identify the full name of the individual in question. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January _19_, 2022

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 01/21/22

Petitioner~Ronald Schneider, Esq.
Respondent DHHS~Shannon Collins, AAG
Intervenor Disability Rights Maine~Staci
Converse, Esq. and Lauren Wille, Esq.

3

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-21-12

FLORA MUGENI,

Petitioner

v.

ORDER

MAINE DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

Respondent

REC'D CUMB CLERKS OF
JAN 20 '22 AM9:12

Before the court is petitioner Flora Mugeni's motion to take additional evidence pursuant to Rule 80C(e).

This is an appeal pursuant to M.R.Civ.P. 80C and 5 M.R.S. §§ 11001-07 challenging an April 28, 2021 decision by the Chief Hearing Officer of Department of Health and Human Services (DHHS) finding that DHHS had correctly substantiated petitioner Flora Mugeni for abuse and neglect of a person with a disability – a client identified in the record as "Mr. F" and referred to in some of the filings as "John Doe."

The record indicates that Mr. F was a person diagnosed as having intellectual disability and diabetes mellitus. Certified Record (hereafter R.) 38. He died of hyperglycemia with ketoacidosis due to his diabetes on August 27, 2019. CR 48. The substantiation of Ms. Mugeni for abuse and neglect of Mr. F is a Level I substantiation, which is reported to registries maintained by the state and federal authorities. to Rule 80C(e).

The motion to take additional evidence is opposed by DHHS and by Intervenor Disability Rights Maine. Under Rule 80C(e), a motion to take additional evidence must be filed within 10 days of the filing of the record. Although DHHS and Intervenor argue that Ms.

Mugeni's motion was untimely, the court file reflects that the record was filed on August 30 and Ms. Mugeni's motion was timely filed 10 days later.[1]

The additional evidence that Ms. Mugeni seeks to add consists of the following: (1) a June 10, 2021 decision by the Board of Nursing, issued after the Chief Administrative Hearing Officer's decision in this case, and (2) evidence of and the rationale for the decisions by DHHS with respect to other individuals involved in the events leading to Ms. Mugeni's Level I substantiation. Several individuals received no sanction; one other individual received a Level II substantiation.

Ordinarily judicial review under Rule 80C and 5 M.R.S. §§ 11001-07 is confined to the record before the agency. 5 M.R.S. § 11006(1). However, additional evidence may be added to the record if the additional evidence

> is material to the issues presented for review and could not have been presented or was erroneously disallowed in proceedings before the agency.

5 M.R.S. § 11006(1)(B).

## Nursing Board Dismissal

In this case the subsequent decision by the Board of Nursing could not have been presented to the agency, and the dispute is whether or not that decision is material to the issue presented for review. According to Ms. Mugeni, the Board of Nursing dismissed a complaint against Ms. Mugeni based on the events that led to the Level I substantiation, finding that there had been no violation of the laws regulating the practice of nursing.[2] Ms.

---

[1] Intervenor argues that the motion should be denied because no Rule 7(b)(1) (A) notice was included but if a 21 day notice is not included, the result is that opposing parties may be heard even if timely opposition is not filed. In this case both the opposing parties filed memoranda, and the court has considered them even though the DHHS opposition was not filed within 21 days.

[2] From Ms. Mugeni's submission, it does not appear that the Board of Nursing engaged in any discussion or analysis of the complaint or set forth any reasons for its dismissal.

2

Mugeni argues that DHHS based its Level I substantiation largely on Ms. Mugeni's status as a registered nurse and that, as a result, the Nursing Board's dismissal is material.

The problem with this argument is that, even if the alleged failures on which DHHS based its Level I substantiation would also arguably constitute violations of laws regulating the practice of nursing – which is not clear from Ms. Mugeni's motion –there is no requirement of which the court is aware that DHHS decisions have to be consistent with Nursing Board decisions. The motion to supplement the record by adding the Board of Nursing's dismissal is denied.

## Evidence as to Substantiation or Non-Substantiation of Other Individuals

Evidence with respect to the sanctions or lack thereof imposed by DHHS on other individuals involved in the events that led to Mr. F.'s death was offered and disallowed by the Administrative Hearing Officer. Ms. Mugeni argues that this evidence was material and was erroneously disallowed. *See* 5 M.R.S. § 1106(1)(B).

This proceeding originated with an appeal by Ms. Mugeni from a decision by DHHS Adult Protective Services that it intended to impose a Level I substantiation. Final decisionmaking authority on Ms. Mugeni's appeal was delegated to the Chief Administrative Hearing Officer, Joseph Pickering (R. 159), and the appeal was referred to Administrative Hearing Officer Tamra Longanecker to hold a hearing, to make findings of fact, and to issue a recommended decision. R. 160-61. The substantiation or non-substantiation of other individuals in the events that lead to Mr. F's death was determined to be irrelevant by Hearing Officer Longanecker. R. 63. When Ms. Mugeni appealed to Chief Administrative Officer Pickering and raised that issue (R. 22, 23-24), Pickering ruled that

> whether other persons have or have not been substantiated has
> no bearing on whether Ms. Mugeni should be substantiated.

R. 3.

3

In the court's view, it is at least conceivable that the imposition of a sanction on Ms. Mugeni and no sanction or a lesser sanction on other individuals – if the others bore considerably more responsibility for Mr. F.'s death and if the disparity was sufficiently egregious – could support an argument that the agency's decision was arbitrary or capricious.[3] Ms. Mugeni already has set forth the Level II substantiation for one individual and the absence of any substantiation for others. (*See* R. 22, 23). As far as the court can tell, that is not disputed by the agency and the court will take that information as true. The record also details the actions and inactions of all of the involved individuals, including the persons who Ms. Mugeni contends should have been sanctioned in lieu of or in addition to Ms. Mugeni.

Accordingly, the court will accept additional evidence limited to the following: that Ms. Best and Messrs. Bourque and Robbins were not substantiated and that Ms. Yombe was issued only a Level II substantiation – points that Ms. Mugeni is already making. However, Ms. Mugeni is not simply seeking to limit her argument to what she contends is the arbitrariness of Ms. Mugeni's Level I substantiation compared to the actions of others. She is seeking to take evidence as to the basis for the DHHS decisions as to those other individuals. That would violate the general rule that inquiry into the mental processes of the agency decision makers is not permitted. *See Carl L. Cutler Co. v. State Purchasing Agent,* 472 A.2d 913, 918 (Ms. 1984). To overcome that rule, a party challenging agency action must at least make a prima facie showing of bad faith or other improper behavior. Ms. Mugeni has made no such showing in this case. Ms. Mugeni has not filed a detailed statement in the nature of an offer of proof, and her suggestion that the taking of additional evidence might uncover some bias is the kind of fishing expedition that is precluded under *Cutler.*

---

[3] DHHS argues, inter alia, that the other individuals cited by Ms. Mugeni had different roles and responsibilities which explains any difference in treatment. The court believes the relevance of their roles and any differences between their roles and that of Ms. Mugeni goes to the merits of the appeal and cannot be decided on this preliminary motion.

4

The entry shall be:

Petitioner's motion to take additional evidence is denied except to the limited extent set forth above. The court specifies the further course of proceedings as follows: petitioner shall file her brief within 40 days of the date of this order, and respondent and intervenor shall file their briefs 30 days after service of petitioner's brief. Petitioner shall have 14 days after service of the last brief of any other party in which to file a reply brief. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January 15, 2022

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 01/21/22

Petitioner–Ronald Schneider, Esq.
Respondent DHHS–Shannon Collins, AAG
Intervenor Disability Rights Maine–Staci Converse, Esq. and Lauren Wille, Esq.

5